550 A.2d 731

**COMSTOCK INSURANCE COMPANY**

v.

**THOMAS A. HANSON & ASSOCIATES, INC., et al.**

No. 480, Sept. Term, 1988.

Court of Special Appeals of Maryland.

Dec. 6, 1988.

David A. Carter (J. Snowden Stanley, Jr., and Semmes, Bowen & Semmes, on the brief), Baltimore, for appellant.

Kenneth F. Spence, III (K. Donald Proctor, and Miles & Stockbridge, on the brief), Towson, for appellees, Carl and Edward Julio.

Argued before MOYLAN, WILNER and ROBERT M. BELL, JJ.

WILNER, Judge.

There are three parties in interest to this dispute over an exclusion clause in an insurance contract. Carl and Edward Julio, together, are developers; Thomas A. Hanson & Associates, Inc. is an engineering firm that provided certain architectural and engineering services to the Julios; Comstock Insurance Company is an insurance company that issued a professional liability insurance policy to Hanson.

The Julios recovered a $287,500 judgment against Hanson for breach of contract and professional negligence. They and Hanson are seeking to have Comstock pay that judgment, which Comstock has so far refused to do. Upon Comstock's complaint for declaratory judgment, the Circuit Court for Baltimore County, applying Illinois law, construed the exclusion clause relied upon by Comstock and declared that Comstock was nonetheless liable. Hence this appeal, in which Comstock complains that the trial court *mis*construed the clause. We shall affirm.

## (1) *The Factual Setting*

In 1983, the Julios became interested in purchasing a warehouse from Levitz Furniture Company and renovating it into an office building and motel complex. They consulted Hanson with respect to the motel phase, seeking, essentially, a determination of whether the project would be economically feasible. The Julios had concluded that, to be economically feasible, the motel would have to be constructed within and utilize part of the existing warehouse structure; to demolish the structure and engage in new construction would be too costly. The Julios stressed upon Hanson the feasibility consideration and the need to have the motel built within the existing warehouse.

Eventually, Hanson prepared and delivered to the Julios preliminary drawings and a handwritten projection of costs, showing that the motel they envisioned could be built within the warehouse structure at a cost of $12,500 per unit. Based on Hanson's drawings and estimate, the Julios concluded that the overall project was economically feasible, and so, effective February 21, 1984, they entered into an agreement with Levitz to buy the property for $4,200,000. The contract called for a $200,000 deposit, which was made. It gave the Julios the option to terminate the agreement and receive back the deposit if, within 20 days, they notified the seller that the property was "unsatisfactory." In the event such notice was not given and the Julios thereafter decided not to proceed, they could cancel the contract upon payment of liquidated damages of $287,500—the $200,000 deposit already made plus an additional $87,500.

In the belief that the motel could be built as Hanson indicated, the Julios did not exercise their right to terminate the contract within the 20–day period and so became bound to it. Thereafter, however, they discovered that the motel could not be built as designed by Hanson and that, to build it within the existing structure would cost over $24,000 per unit; new construction would cost well over $19,000 per unit. That, in their view, made the project unfeasible, and

so, to contain their loss, they defaulted on the contract and forfeited the $287,500 in liquidated damages.

The initial lawsuit was filed in the Circuit Court for Baltimore County by Hanson, who charged the Julios with breach of the AIA contract they had entered into in March, 1984. The Julios responded, in part, with a counterclaim charging Hanson with breach of contract and negligent misrepresentation. The gravamen of both counts of the counterclaim was the averment that:

"[Hanson] represented to the [Julios] that the motel portion of the complex could be built at a cost of $12,500 per unit, or a total cost, including a restaurant, but excluding demolition, of $2,750,000. [Hanson] also represented to the [Julios] that the entire four-story motel portion of the complex could be built within the existing warehouse structure for the aforementioned amount. In connection with these representations, [Hanson] supplied the [Julios] with certain design documents, which indicated that the motel portion of the complex could be built within the existing warehouse structure."

These representations, the Julios continued, were false, were justifiably relied upon, and caused damage when it turned out that the Julios could not proceed and had to forfeit the $287,500.

The *Hanson v. Julio* action was tried non-jury before Judge Fader. In a memorandum opinion and judgment filed in May, 1986, Judge Fader dismissed the action by Hanson on the dual grounds that (1) it was a foreign corporation that regularly did business in Maryland but had failed to register to do business in this State and, (2) although the basis of its contract with the Julios was the provision of architectural services, neither Hanson nor its employees were licensed architects. These deficiencies, Judge Fader found, precluded Hanson from bringing and maintaining an action in a Maryland court. With respect to the counterclaim, Judge Fader credited the evidence produced by the Julios and concluded that Hanson had erred both in its design for building the motel within the existing

warehouse structure and in its estimate of the probable cost of construction.

The error in the cost estimate, Judge Fader found, was attributable in part to the error in design and in part to mistakes in some of the component cost figures and assumptions. As to the first aspect, Judge Fader noted that:

"Problems with the Hanson design started to develop immediately. Of much concern and the subject of much discussion were the following issues: (1) whether the outside wall panels could be coordinated with inside room formats and window locations; (2) whether four full floors of rooms could be placed within the existing structure; (3) whether the existing slab would support the new structure and allow utility installation to the rooms; and (4) how and where the bearing walls and columns were and could be placed."

Judge Fader recounted the evidence bearing on some of these design problems, noting in particular the testimony of a structural engineer testifying for the Julios that "Hanson did not properly take into account the existing building's columns and necessary coordination with the room and window location." Though raising doubt as to some aspects of the opinions from the Julios' experts, Judge Fader believed "the overall content of these opinions ... to be correct and against the Hanson position." His conclusion, then, as to this aspect of the problem, was that:

"There was on Hanson's part a great misconception of the Levitz building structure and the ability to use that structure with its existing columns, panels, slab floor and possibly the roof structure to accommodate the four-story motel to be placed thereon at the cost Hanson proposed. The costs of accommodation were far in excess of the Hanson estimate...."

Additionally, Judge Fader concluded that, in applying a published square foot estimate of cost, Hanson had erroneously neglected to add on a 15% overhead and profit figure and that it further erred in using a single, general square

foot cost figure without taking into account more specific cost estimates that were available.. As to this, Judge Fader stated:

"Hanson made another mistake in using the Means publication. Increased construction costs are evident in the Means square foot costs for a hotel, 4–7 story, as compared with a motel, 2–3 story, from that same publication. Testimony on this point was not exhaustive but it was sufficient to satisfy the Court of the correctness of the Julio position; namely, that the four-story Julio project falls somewhere between the building and structure requirements evidenced by these separate estimates. Hanson's reliance on a publication using a single cost figure under the label of 'Motels' was error and not accepted in the trade."

Upon these findings, the court entered judgment on the counterclaim in favor of the Julios for $287,500.

Aggrieved by that result, Hanson appealed. In a *per curiam* Opinion filed March 27, 1987, however, this Court affirmed. After reciting the procedural history of the case, we stated:

"We have carefully examined the record in this case and find ample evidentiary support for all of Judge Fader's factual findings. We perceive no error in his application of the law to those findings. For the reasons stated in the opinion of the trial court, which we hereby adopt as our own, the judgment is affirmed."

*Hanson v. Julio,* unreported, Sept. Term, 1986, No. 897, Op. filed March 27, 1987.

Hanson, supported by its erstwhile foes, the Julios, then turned to Comstock for payment of the judgment. Comstock, as we observed, had issued an Architects and Engineers Professional Liability Insurance Policy to Hanson. In that policy, Comstock agreed to pay on behalf of Hanson "all sums which the Insured shall become legally obligated to pay as damages as a result of claims first made against the Insured ... in the performance or failure to perform

professional services...." In the "Exclusions" section, however, the policy stated: "This policy does not apply to ... (F) express warranties or guarantees, estimates of probable construction or cost estimates being exceeded...."

Believing that the judgment against Hanson was based on an estimate "of probable construction or cost estimates being exceeded" and thus fell squarely within Exclusion (F), Comstock denied liability and filed this declaratory judgment action in the Circuit Court for Baltimore County seeking a construction of the policy favorable to its point of view. Hanson, of course, was the initial defendant, but the Julios were permitted to intervene. Presented with cross motions for summary judgment, the court, through Judge Sfekas, concluded that (1) Illinois law—the *lex locus contractus*—applied, (2) under Illinois law, "where a policy expressly insures against loss covered by one risk but excludes loss caused by another risk, coverage is extended to a loss caused by the insured risk even though the excluded risk is a contributory cause," (3) based on Judge Fader's findings, while in part the loss arose from an overage in the cost estimate, "Hanson's professional negligence was a contributory cause, if not in fact that proximate cause of Julio's injuries," and (4) the loss therefore did not fall within Exclusion (F). Accordingly, the court entered judgment against Comstock for $287,500, and this appeal was taken.

Comstock makes three arguments. First, it urges that Judge Sfekas erred in finding that the loss to the Julios was not solely the product of Hanson's negligent estimate of probable construction costs. The evidence before Judge Fader, and Judge Fader's factual findings, it says, compels the conclusion that the loss stemmed entirely from an erroneous cost estimate, which would put the loss squarely within Exclusion (F). Second, picking up on one brief remark in Judge Sfekas's memorandum opinion, Comstock contends that he added an element to the exclusion that is not in the contract and thus misconstrued the exclusionary

clause. And finally, it argues that Judge Sfekas misconstrued the applicable Illinois law—that this was not a situation in which one risk was covered and one was not, but rather a case in which one area of a single risk was excluded.

### (2) *The Legal Setting*

■ As a preface, we observe that all parties agree that the policy is to be construed in accordance with Illinois law. The policy was issued in Illinois, and, as a general rule, an insurer's liability is determined by the law of the place where the contract was made. *See Galford v. Nicholas, Adm.,* 224 Md. 275, 281, 167 A.2d 783 (1961); *Grain Dealers v. Van Buskirk,* 241 Md. 58, 65–66, 215 A.2d 467 (1965); *Billingsley v. Lincoln Nat'l Bank,* 271 Md. 683, 685 n. 1, 320 A.2d 34 (1974). We look, then, to see what the Illinois law is in this area.

■ Citing one line of cases applying Illinois law, Comstock argues that, in order for coverage to exist, the covered event must be the "significant" or the "efficient and predominating" cause of the loss. *See Am. States Ins. Co. v. Byerly Aviation, Inc.,* 456 F.Supp. 967 (S.D.Ill.1978); *General Accident Fire & Life Assurance Corp. v. Brown,* 35 Ill.App.2d 43, 181 N.E.2d 191 (1962); *Bituminous Casualty Corp. v. Hartford Accident & Indemnity Co.,* 330 F.2d 96 (7th Cir.1964); *Clark v. Travelers Indemnity Co.,* 313 F.2d 160 (7th Cir.1963). Here, it argues, the "significant" or "efficient and predominating" cause of the loss was the excluded one, not the covered one. Alternatively, or additionally, it cites another line of cases for the proposition that, for coverage to exist in the face of an exclusion, the loss must arise and exist without reference to an excluded event. *See Louis Marsch, Inc. v. Pekin Insurance Co.,* 140 Ill.App.3d 1079, 96 Ill.Dec. 386, 491 N.E.2d 432 (1985); *Allstate Insurance Co. v. Panzica,* 162 Ill. App.3d 589, 114 Ill.Dec. 28, 515 N.E.2d 1299 (1987); *State Farm & Cas. Co. v. McGlawn,* 84 Ill.App.3d 107, 39 Ill.Dec. 531, 404 N.E.2d 1122 (1980). Here, it contends, the loss

cannot be said to arise without reference to an excluded event—the negligent underestimate of probable cost.

Hanson and the Julios, on the other hand, dismiss the *Louis Marsch* line of cases as involving negligent entrustment claims and therefore as inapposite and argue that Illinois has discarded the "significant" or "efficient and predominating" tests in favor of a rule that, if a proximate cause of a loss is within the included coverage, that coverage is not voided merely because an additional proximate cause falls within an exclusion. For that proposition, they cite *United States Fidelity & Guaranty Co. v. State Farm Mut. Auto Ins. Co.*, 152 Ill.App.3d 46, 105 Ill.Dec. 254, 504 N.E.2d 123, *cert. denied* 115 Ill.2d 551, 110 Ill.Dec. 466, 511 N.E.2d 438 (1987), *Davis v. Sheehan*, 43 Ill.App.3d 449, 2 Ill.Dec. 523, 357 N.E.2d 690 (Ill.App.1976), and *Mattis v. State Farm Fire & Casualty Co.*, 118 Ill.App.3d 612, 73 Ill.Dec. 907, 454 N.E.2d 1156 (1983).

These various cases do say what the parties claim they say. None of them involves the precise point now before us, however, and none of them, in our view, directly controls that issue.

The first group of cases cited by Comstock did indeed speak in terms of "efficient and predominating cause," but one must look at the context in which that language was used. In *General Accident Fire and Life Assur. Corp. v. Brown, supra*, 181 N.E.2d 191, the principal issue was not the scope of an exclusionary clause but whether the loss fell within the general coverage. A general automobile liability policy covered, among other things, accidents arising from the loading or unloading of insured vehicles. The claimant was injured during a loading operation, and so a demand was made on the policy.

The court pointed out that the mere use of an insured vehicle during the loading operation did not suffice to establish coverage; there must also be "a causal connection between the use of the truck and the injury." Thus, it said, "unless we can determine that the loading of the truck was

the efficient and predominant cause of [the claimant's] injury, the matter will not come within the terms of the . . . policy." 181 N.E.2d at 194. In the particular case, the court went on, the claimant maintained that his injury resulted solely from a defect in the loading dock; there was no assertion that his carrying of merchandise "in any way contributed to his fall, [or] that any merchandise or anything connected with the loading operation or the truck itself in any way caused his injury." *Id.* On those facts, the court found no coverage.

*Clark v. Travelers Indemnity Co., supra,* 313 F.2d 160, and *Bituminous Casualty Corp. v. Hartford Accident and Indemnity Co., supra,* 330 F.2d 96, are also "loading" cases in which the Seventh Circuit Court of Appeals followed *Brown.* In both instances, although the injury occurred while a loading operation was in progress, the cause of the injury was entirely unconnected with the loading operation.

*Am. States Ins. Co. v. Byerly Aviation, Inc., supra,* 456 F.Supp. 967, involved essentially the same principle but in the context of an exclusionary clause. An aircraft liability policy insured against damages for bodily injury or death sustained by a passenger arising out of the use of the insured helicopter. A specific exclusion, however, provided that the policy did not apply if the helicopter was being operated by anyone other than two named pilots. The claimant, a student, was killed while on a teaching flight when the rotor broke and the helicopter crashed. Citing the exclusionary clause, the insurer denied liability on the ground that the pilot was someone other than the two named in the policy.

Rejecting that defense, the court observed initially that, under Illinois law, insurance policies are construed liberally in favor of the insured and that "where an insurer relies upon an exclusion as a defense, it has the burden of showing that the loss involved falls within such exclusion." 456 F.Supp. at 968. Moreover, as Illinois law requires the existence of a causal connection in order for coverage to be

afforded, the court said that it would be unfair "not to require such connection between the loss which occurs and the exclusion, in order for the insurer to successfully escape coverage...." *Id.* at 970. As to the exclusion at issue, the court continued:

"The only reasonable purpose of such an exclusion is to limit the insurer's liability for potential losses caused by pilot error or negligence by an unskilled pilot. The policy quite reasonably insures against pilot error or negligence only with respect to those pilots whom the insurer has considered to be acceptable risks. However, there is nothing in the record to suggest that pilot error or negligence was any part of the cause of the helicopter crash involved here. Assuming that pilot conduct did not cause the tragedy, there is no connection between the cause of the loss and the exclusion."

On that basis, the court refused to apply the exclusionary clause; it was, in a nutshell, irrelevant.

As Hanson and the Julios point out, the second line of cases cited by Comstock involved claims based on negligent entrustment. The seminal case, in Illinois, was *State Farm Fire & Cas. Co. v. McGlawn, supra*, 39 Ill.Dec. 531, 404 N.E.2d 1122. A homeowners' policy provided general liability coverage but excluded claims or losses arising out of the use or maintenance of any motor vehicle loaned to an insured. One insured, McGlawn, Sr., lent his motorcycle to his son, McGlawn, Jr., who also was an "insured" under the policy. McGlawn, Jr. injured the claimant while operating the motorcycle. The claimant sued McGlawn, Sr. for negligent entrustment; McGlawn, Sr. demanded coverage under the homeowners policy; the company denied liability; and a declaratory judgment action was filed.

Siding with the insurer, the court noted first that "[i]n order to state a cause of action for negligent entrustment two elements must appear: (1) A negligent entrustment, and (2) that the incompetence of the entrustee was the proximate cause of the injury." 39 Ill.Dec. at 533, 404 N.E.2d at 1124. Continuing:

"As is obvious from the foregoing, the first element concerns itself with conduct only; the second concerns itself not only with conduct but with an instrumentality, in most cases a motor vehicle. If there exists a specific exclusion in the policy as to the instrumentality, there can be no coverage."

The policy at issue, said the court, "specifically excludes motor vehicles"; *ergo*, no coverage.

The other cases in that line cited by Comstock are to the same effect. As more succinctly stated in *Allstate Ins. Co. v. Panzica, supra,* 114 Ill.Dec. at 28, 30–31, 515 N.E.2d at 1299, 1301–02: "Under Illinois law it is clear that where the instrumentality which causes the injury is excluded, no liability coverage is afforded for negligent entrustment of the instrumentality. This is because an injury resulting from the use of the instrumentality is a necessary element of the cause of action."

The three cases principally relied on by Hanson and the Julios are also, in a sense, fact-specific. In *Davis v. Sheehan, supra,* 357 N.E.2d 690, for example, a farmer, through his three employees, mistakenly loaded field corn into a bin leased to the plaintiff, ruining the seed corn that the plaintiff had stored in the bin. The farmer sought coverage under three insurance policies, the one relevant here being an automobile policy insuring a truck used in the operation. That policy covered losses arising from unloading the truck, and it was on that basis that the farmer sought coverage. The insurer, insisting that the "efficient and predominating" cause of the loss was not so much the unloading operation itself as the farmer's negligence in failing to give clear instructions to his employees as to which bin to use, denied liability.

Although the Court reviewed the *Brown, Clark,* and *Bituminous Cas. Corp.* cases cited above and discussed the "efficient and predominant" cause standard, its conclusion that coverage existed was based on its determination that, unlike the situations in those cases, the loss did, in fact,

arise out of the unloading operation. Responding to the insurer's argument, however, the Court observed, 2 Ill.Dec. at 527–28, 357 N.E.2d at 694–95:

> "If the [farmer's] employees at the bin were engaged in unloading, and their acts in unloading were sufficient to impose on them tort liability, it would be illogical to deny them insurance coverage because a concurrent cause of the damage to the seed corn was more predominating.... The [Illinois] Supreme Court has not passed on the 'efficient and predominating cause' rule. We do not apply it to reach the result requested by [the insurer]. When tort law recognizes multiple acts as giving rise to a separate tort liability for the same injury, a rule of contract law construing liability insurance policies with a more restrictive concept of causation, creates many problems."

*Mattis v. State Farm Fire & Cas. Co., supra,* 73 Ill.Dec. 907, 454 N.E.2d 1156—the case principally relied on by Judge Sfekas—involved a homeowners policy insuring against all risks of physical loss except those specifically enumerated in various exclusionary clauses. Improper design or construction of the dwelling was not listed among any of the exclusions. Five years after they bought their home, the insureds observed that part of the basement wall was buckling. The problem grew progressively worse and was very expensive to repair. Claim was made on the policy.

There was evidence that the problem could have resulted from a number of things that were indeed excluded under the policy. But the trial court found that *one* cause of the problem was improper design or construction. Quoting from a Wisconsin case, the Court declared that, "Where a policy expressly insures against loss caused by one risk but excludes loss caused by another risk, coverage is extended to a loss caused by the insured risk even though the excluded risk is a contributory cause." *Id.* 73 Ill.Dec. at 912, 454 N.E.2d at 1161.

On that basis—that improper design or construction was a contributing cause and a covered risk—the Court found the insurer liable.

The third case cited by Hanson and the Julios—*U.S. Fidelity & Guar. Co. v. State Farm Mut., supra,* 105 Ill.Dec. 254, 504 N.E.2d 123—is, in some respects, similar to *Mattis.* At issue was a general liability policy issued to a day care center and its proprietor. The policy covered losses arising from the failure to provide adequate supervision of the children but excluded losses arising from the operation or use of an automobile. The claim in dispute arose when a child fell out of a station wagon being operated by the insured's employee. There were, at the time, eight to ten children in the vehicle with only the driver to supervise. In an action filed against the day care center, the child's parents alleged both the failure to provide adequate supervision and the negligent operation of the station wagon. Contending that the injuries "could not have occurred without the operation or use of the station wagon," the insured denied liability. The Court rejected that defense, holding 105 Ill.Dec. at 256, 504 N.E.2d at 125:

"USF & G's argument overlooks the fact that there may be more than one proximate cause of an injury. A proximate cause of an injury is any cause which, in natural or probable sequence, produced the injury complained of. It need not be the only cause, nor the last or nearest cause. It is sufficient if it concurs with some other cause acting at the same time, which in combination with it, causes the injury. If a proximate cause of an injury is within the included coverage of an insurance policy, the included coverage is not voided merely because an additional proximate cause of the injury is a cause which is excluded under the policy. *Thus, in order for an injury to be excluded from coverage under an insurance policy, the injury must have been caused solely by a proximate cause which is excluded under the policy.* The insurance carrier has the burden of proof as to

whether the injury was caused solely by a proximate cause which is excluded under the policy."
(Citation omitted; emphasis added.)

None of these decisions or pronouncements, we observe, are of the Illinois Supreme Court. They all represent either intermediate appellate court decisions or those of Federal courts attempting to divine what the Illinois Supreme Court would hold. Nor are they necessarily in conflict. The parties, we think, have paid more attention to some of the language used by the courts than to the context of its use and thus have missed the forest for the trees. From the cases cited, we perceive the Illinois law to be as follows:

(1) Where the insured is seeking to have the insurer pay a loss or defend a claim, he has the burden of establishing that the loss or claim falls within either the general or a specific coverage of the policy. As part of that burden, he must show a clear causal connection between an act or event insured against and the injury or loss. The "efficient and predominant" standard has been applied in that context.

(2) Where the insurer seeks to escape liability on the ground that the loss or claim falls within a specific exclusion in the policy, it has the burden of showing that the exclusion applies. As part of that burden, it must prove a causal connection between the excluded act or event and the loss. The "efficient and predominant" standard, if applicable to the insured's burden under (1), would also be applicable to the insurer's burden. Moreover, in this regard, exclusionary clauses are narrowly construed against the insurer; policies are liberally construed in favor of the insured.

(3) If the loss or claim arises from multiple contributing causes and any one of the causes is within the policy coverage and is not excluded, the insurer is liable even if other contributing causes are specifically excluded from coverage. In that situation, the "efficient and predominant" standard is not applied to measure the relative contri-

bution of the covered and excluded causes. The covered, non-excluded cause need not be the "more efficient" or "predominant" one; it need only be a contributing one. Thus, as was stated in the *USF & G* case, *supra*, for an otherwise covered injury to be excluded "the injury must have been caused *solely* by a proximate cause which is excluded under the policy." 105 Ill.Dec. at 256, 504 N.E.2d at 125. (Emphasis added.)

### (3) *Discussion*

As we observed in part (1) of this Opinion, the Julios' counterclaim against Hanson was based on two alleged misrepresentations—that the motel could be built within the existing warehouse structure as indicated on the preliminary drawings prepared by Hanson and that it could be so built at a cost of $12,500/unit. Judge Fader found that both representations were incorrect. He concluded that Hanson had erred in two independent respects—in the overall design, which was based on a "great misconception" of the ability of the existing structure to accommodate the motel, and in the actual calculation of the probable cost of construction. Both errors contributed to the overall, ultimate underestimate of cost.

Comstock looks solely at the end result of its insured's negligence—the underestimate. The loss, it urges, arose entirely from the fact that Hanson's "probable construction or cost estimates [were] exceeded," and that loss falls within Exclusion (F). That approach, we think, is much too simplistic, for, if we followed that line of reasoning, the exclusion would tend to swallow the policy.

Few engineering or architectural contracts, we expect, are on a "cost is no object" basis. Whether the engineer or architect is given a target figure within which to work or is expected to estimate the cost of implementing his design, the employer generally wants, and is given, either expressly or implicitly, some assurance that the project as designed can be built within a certain cost range. We also think it reasonable to suppose that if the engineer or architect

develops a design that will not work—that cannot be feasibly or safely implemented—that negligence is probably going to have an adverse impact on the cost of the project. In every such case, then, where, because of a faulty design, the project ends up costing more than was estimated or has to be abandoned, the argument could be made that the loss suffered by the employer stemmed from the cost estimate "being exceeded" and is therefore not covered under the policy.

Such a broad reading of Exclusion (F) would be wholly inappropriate, especially under Illinois law which, as noted, requires a restrictive construction of exclusions. We think that the better approach is to be somewhat more circumspect and examine the nature and cause of the cost overrun. Certainly, as Judge Sfekas remarked, if the overrun res" from events beyond the engineer/architect's control ᴀ ᴜ that he could not reasonably have anticipated or measured in the preparation of his cost estimates, the exclusion would apply. As to those causes, the exclusionary clause would be more in the nature of a clarification than an actual withdrawal from coverage, since, if they did not arise from the designer's negligence in the first place, there would likely be no liability on his part and therefore no indemnity coverage under the general insuring clause.

Although clauses similar to Exclusion (F) are apparently common in architects and engineers liability insurance policies (*see* 3 S. Stein, *Construction Law* § 13.06[4][f] (1988); *also* F. Baltz, *Selecting a Professional Liability Insurance Policy for Design Professionals* (1984)), we have been unable to find any reported cases specifically construing such clauses, and none have been brought to our attention by the parties. A reasonable argument can be made that Exclusion (F) covers more than simply events and causes beyond the engineer/architect's control. Indeed, Comstock makes that very argument, contending that Judge Sfekas unduly narrowed the exclusion to "circumstances beyond Hanson's control, such as a strike, increased cost of goods and building supplies or Act of God...." Assuming *ar-*

*guendo* that the clause is not so limited and does in fact include events or causes that *were* within Hanson's ability to control or predict, that still does not require that the clause be given unlimited scope.

At most, we believe, the exclusion would cover mistakes in the preparation of the estimate itself—errors in estimating the quantity or quality of materials that will be needed, or in applying or estimating component costs, or in arithmetic or other aspects of calculating or constructing the estimate. But if the overrun results from an underlying defect in either design or other basic engineering work, the exclusion would not apply. *That* kind of negligence is precisely what the policy was intended to cover, even if its effect is a cost overrun.

Here, as indicated, the underestimate resulted from both basic design defects and errors in the estimating process. One cause is covered; the other is excluded. Under our analysis of Illinois law, then, Comstock is liable.

JUDGMENT AFFIRMED; APPELLANT TO PAY THE COSTS.