Ross G. BLECKNER, Plaintiff,

v.

GENERAL ACCIDENT INSURANCE CO. OF AMERICA, Defendant.

No. 86 Civ. 9881 (RPP).

United States District Court, S.D. New York.

May 15, 1989.

On Motion to Vacate June 9, 1989.

Dennis D'Antonio, Ira Myers, Weg and Myers, New York City, for plaintiff.

Joel Lieber, Eugene Lieber, New York City, for defendant.

OPINION AND ORDER

ROBERT P. PATTERSON, Jr., District Judge.

Ross G. Bleckner, a New York citizen, brought this diversity action against General Accident Insurance Co. of America, a Pennsylvania corporation, seeking one hundred thousand dollars in compensatory damages for breach of contract, and one million, five hundred thousand dollars in punitive damages for "criminal indifference to civil obligations." *See* Complaint ¶¶ 5–

13. Bleckner and General Accident have each moved for summary judgment under Fed.R.Civ.P. 56, and General Accident has moved for the imposition of sanctions against Bleckner's lawyers under Fed.R. Civ.P. 11. Neither of Bleckner's two counts deserves resolution by a jury, for "there is no genuine issue as to any material fact" and the defendant "is entitled to a judgment as a matter of law." Fed.R.Civ. P. 56(c). The course of this entire lawsuit, moreover, reveals that Bleckner's claims were neither "well grounded in fact" nor "warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law." Fed.R.Civ.P. 11. For the reasons following, therefore, the Court grants the defendant's motions and denies the plaintiff's motion, and enters judgment in favor of the defendant and conditionally enters sanctions against the plaintiff's counsel. *Cf. Donahue v. Windsor Bd. of Fire Comm'rs*, 834 F.2d 54, 58 (2d Cir.1987) ("summary judgment allows the court to dispose of meritless claims before becoming entrenched in a frivolous and costly trial").

### Background

Ross G. Bleckner, the plaintiff in this case, first contracted with General Accident Insurance Co. of America ("GAI"), the defendant, on July 11, 1979, using the standard form "Homeowners Renewal Certificate," which provides for the automatic annual renewal of a policy upon payment of the policyholder's premium. A homeowner's policy and premiums are commonly utilized by tenants of New York City apartments to insure the safety of the apartments' contents and to provide for recovery in the case of accidents occurring therein to guests or other persons. Bleckner, who in 1979 rented the sixth floor loft of Seventy-seven White Street in Manhattan, paid the requisite premium and his policy was duly renewed in 1980, 1981, and 1982. As of September 2, 1982, Bleckner was covered through September 1, 1983 under policy number H–082–581–91.

The contract between Bleckner and GAI was the July 1977 New York edition of the standard "Homeowners 4 Contents Broad Form," as amended in March 1980. "Section II—Liability Coverages—Coverage E—Personal Liability," provided as follows:

If a claim is made or a suit is brought against any insured for damages because of bodily injury or property damage to which this coverage applies, we will:

a. pay up to our limit of liability for the damages for which the insured is legally liable; and

b. provide a defense at our expense by counsel of our choice. We may make any investigation and settle any claim or suit that we decide is appropriate. This applies even if the claim or suit is groundless.

Contract between Ross G. Bleckner and General Accident Insurance Co. of America at 1 of 3, 9 of 12 [hereinafter *Contract*]. "Section II—Exclusions," provided further that

1. Coverage E—Personal Liability ... do[es] not apply to bodily injury or property damage:

.    .    .    .    .

b. arising out of business pursuits of any insured or the rental or holding for rental of any part of any premises by any insured.

.    .    .    .    .

d. arising out of any premises owned or rented to any insured which is not an insured location.

Contract at 9 of 12. The contract defined "business" as "includ[ing] trade, profession or occupation." *Id.* at 1 of 12. The contract defined an "insured location" as, among other things, "the residence premises" and "any premises used by you in connection with the" residence premises, and "residence premises" meant "the one or two family dwelling, other structures, and grounds or that part of any other building *where you reside* and which is shown as the 'residence premises' in the declaration." *Id.* at 1 of 12, 2 of 12 (emphasis added). The policy was clearly meant to cover the loft—which alone was Bleckner's residence. The declaration, however, listed no "premises location" dif-

ferent from Bleckner's mailing address, which was "77 White Street; New York, NY, 10013," an address that on its face included the five floors where Bleckner did not live. The declaration limited coverage for personal liability to one hundred thousand dollars.

Seventy-seven White Street Associates, a New York partnership formed between Ross Bleckner and his father, Fred Bleckner, owns the eponymous six story structure at Seventy-seven White Street, between Lafayette Street and Broadway, in Manhattan. The partnership bought the building on February 4, 1983, from Steven Maas, proprietor of the late, lamented Mudd Club, which then occupied the building's first five floors. On the same day that they purchased the building, the partnership acquired a special multi-peril insurance policy from the Horizon Insurance Co. providing for liability limits of five hundred thousand dollars. Ross Bleckner has lived in a loft on the building's sixth floor since July 1974, with time off for periodic vacations. An artist, Bleckner uses the loft for both a studio and a home. An elevator shaft and a stairway, both separate from the living and working spaces, open onto the sixth floor. The elevator shaft opens out, past a metal door with an outside lock, onto Cortlandt Alley, a narrow byway that abuts the building's west face and reaches about a hundred feet south towards Franklin Street. The interior stairway leads to a front door on White Street.

On the evening of July 22, 1983, Michael Gordon of Dubuque, Iowa attended a dinner party at the sixth floor loft. His host was Justin Kelly, who, in return for sanding floors, painting walls, generally improving the other lofts, and taking over Bleckner's managerial responsibilities, was spending the summer in Bleckner's apartment while Bleckner took a vacation. Gordon arrived at Kelly's party, stayed a while, then left. He soon decided to return. Gordon walked to the side of the building on Cortlandt Alley. He unlocked the doors of the building's elevator, pulled them open, stepped forward, and fell to the bottom of the elevator shaft.

In January 1984, Gordon brought a tort action in the Supreme Court of the State of New York for New York County. In his complaint, Gordon named as a defendant Seventy-seven White Street Associates, which owned, "operated, ... managed, ... controlled, ... maintained, ... repaired, ... supervised, ... and inspected" the "building and elevator located at 77 White Street." Complaint ¶¶ 2–11, in *Gordon v. Seventy-seven White Street Associates, et al.* (Sup.Ct. N.Y. County) [hereinafter *Gordon* complaint]. Gordon also sued Ross Bleckner, "a general partner of defendant Seventy-seven [White Street Associates]," and Fred Bleckner, "a general partner of defendant Seventy-seven [White Street Associates]," both of whom "operated, managed, maintained, supervised and controlled" the building and elevator, and Circle Elevator Corp., which serviced the elevator.[1] *Gordon* complaint, *supra*, ¶¶ 12–19. Gordon's first count alleged negligence. His second count charged the defendants with maintaining a public nuisance. His third and fourth counts alleged breaches of express and implied warranties. The fifth count sounded in strict products liability.

The trial in *Gordon v. Seventy-seven White Street Associates, et al.* began on May 6, 1985. On May 15, Michael Gordon and his parents, Gene and Virginia Gordon, settled with Seventy-seven White Street Associates and the Bleckners. In accordance with the terms of the settlement, the partnership's insurer, Horizon Insurance Co., paid the Gordons five hundred thousand dollars, and Fred Bleckner signed a confession of judgment that read as follows:

Fred Bleckner, being duly sworn, deposes and says; that deponent is a defendant [in *Gordon v. Seventy-seven White Street Associates, et al.*]. The defendant hereby confesses judgment herein and authorizes entry thereof against defen-

1. Gordon also sued Steven Maas of the Mudd Club, apparently because he thought Maas was a partner in Seventy-seven White Street Associ-

ates. Gordon never served Maas, however, and the case against him was dismissed.

dant in the sum of $500,000.00 (Five Hundred Thousand and 00/100)....
This confession of judgment is for a debt justly to become due to the plaintiff arising from the following facts:

The plaintiff sustained personal injuries on property owned by a partnership owned and controlled by the defendant herein on July 23, 1983. A stipulation of settlement of the above named action as it pertains to this defendant is annexed and made part thereof.

In the stipulation of settlement, the parties agreed that

[t]he defendant, Fred Bleckner[,] shall sign a series of personal promissory notes in the following amounts and due at the following times:

a. On or before June 15, 1985; the sum of $100,000.00;

b. On or before July 15, 1985; the sum of $100,000.00;

c. On or before August 15, 1985; the sum of $100,000.00;

d. On or before September 15, 1985; the sum of $200,000.00.

After the settlement, the case continued to a verdict. On May 17, the jury found Circle Elevator 25% at fault, and the court entered judgment against it for $953,281.62.

On May 1, 1985—five days before the *Gordon* trial began and almost twenty-two months after Gordon's accident—GAI received a notice reporting a claim by Ross Bleckner under policy number H–082–581–91. In a letter dated June 18, 1985, William Taylor, a claims manager at GAI, informed Bleckner that GAI had reviewed his homeowner's policy, and that it had decided to deny him coverage. GAI pointed to the exclusions listed in section II (quoted above). Taylor wrote in the letter that "[s]ince the accident occurred in the elevator and the building owned by Seventy-seven White Street Associates and Fred Bleckner, no coverage applies in this case." *See also* deposition of Leah Lovett at 42–65 (Feb. 9, 1988). Ross Bleckner filed this suit against GAI on December 29, 1986.

### Discussion

Because this is an action for breach of an insurance contract, special legal principles govern its resolution. Like most other states, New York protects consumers by imposing a high standard of contractual care on insurers. Thus,

whenever an insurer wishes to exclude certain coverage from its policy obligations, it must do so "in clear and unmistakable" language. Any such exclusions or exceptions from policy coverage must be specific and clear in order to be enforced. They are not to be extended by interpretation or implication, but are to be accorded a strict and narrow construction. Indeed, before an insurance company is permitted to avoid policy coverage, it must satisfy the burden which it bears of establishing that the exclusions apply in the particular case, and that they are subject to no other reasonable interpretation.

*Seaboard Surety Co. v. Gillette Co.*, 64 N.Y.2d 304, 311, 476 N.E.2d 272, 486 N.Y.S.2d 873 (1984) (citations omitted). Furthermore, the insurer must show that the insured's construction of contractual provision is unreasonable, and that the insurer's gloss is "the only one that fairly could be placed on the policy." *Bronx Savings Bank v. Weigandt*, 1 N.Y.2d 545, 552, 136 N.E.2d 848, 154 N.Y.S.2d 878 (1956). At the same time, however, although

the general rule [is] that ambiguities in an insurance contract are to be construed against the insurer, [a] court may not make or vary the contract of insurance to accomplish its notions of abstract justice or moral obligation, since "[e]quitable considerations will not allow an extension of the coverage beyond its fair intent and meaning in order to do raw equity and to obviate objections which might have been foreseen and guarded against."

*Breed v. Insurance Co. of North America*, 46 N.Y.2d 351, 355, 385 N.E.2d 1280, 413 N.Y.S.2d 352 (1978) (citations omitted); *see Caporino v. Travelers Ins. Co.*, 62 N.Y.2d 234, 465 N.E.2d 26, 476 N.Y.S.2d 519 (1984) (per curiam); *Zandri Constr. Co. v. Fire-*

*men's Ins. Co.*, 81 A.D.2d 106, 440 N.Y. S.2d 353, *aff'd*, 54 N.Y.2d 999, 430 N.E.2d 922, 446 N.Y.S.2d 45 (1981); *see also Eastern Associated Coal Corp. v. Aetna Casualty & Sur. Co.*, 632 F.2d 1068, 1075 (3d Cir.1980) ("A court should not torture the language of the policy in order to create ambiguities"), *cert. denied*, 451 U.S. 986, 101 S.Ct. 2320, 68 L.Ed.2d 843 (1981); *Canal Ins. Co. v. Earnshaw*, 629 F.Supp. 114, 118 (D.Kan.1985) ("The court will not torture words to import ambiguity when ordinary meaning leaves no room for such").

### A. Compensatory Damages for Breach of Contract

GAI based its denial of Bleckner's claim on two exclusions, one of which covered personal injury "arising out of any premises owned ... by any insured which is not an insured location," and one of which covered personal injury "arising out of business pursuits of any insured." As noted above, an "insured location" was defined as meaning, among other things, "the residence premises" and "any premises used by you in connection with the" residence premises. Although the renewal certificate listed "77 White Street" as the insured location, and did not mention the sixth floor, in both his deposition in this case, and on direct and cross examination during the *Gordon* trial, Bleckner gave testimony showing that the parties did not intend to include either the premises other than the sixth floor or the elevator as an "insured location." He also gave testimony showing that after the purchase of Seventy-seven White Street the remainder of the building was being held for rental, an exclusion under the policy, and that the elevator was only to be used for maintenance. In *Gordon*, for example, Bleckner was asked on cross examination, "You only live on the sixth floor, is that correct, Mr. Bleckner?" Bleckner answered "Yes." Bleckner also testified that before Justin Kelly moved into Bleckner's loft he told Kelly that although Kelly could use the elevator for his renovation work on the other floors, "he should never use that elevator as a passenger elevator." Bleckner's ordinary means of ingress and egress to his apartment

were the stairs. Only rarely did the building's previous owner, the Mudd Club, permit Bleckner to use the elevator. In fact, Bleckner admitted, "I knew it was a freight elevator." Under these circumstances, and in light of the fact that immediately upon the building's purchase the partnership obtained coverage from Horizon Insurance Co., it is unlikely that Bleckner considered the freight elevator an "insured location."

In any event, there is no genuine issue of material fact as to whether Michael Gordon's injury arose out of Ross Bleckner's "business pursuits." The "business pursuits" clause in the contract is clear and unambiguous. *See Shapiro v. Glens Falls Ins. Co.*, 47 A.D.2d 856, 365 N.Y.S.2d 892 (1975), *aff'd*, 39 N.Y.2d 204, 347 N.E.2d 624, 383 N.Y.S.2d 263 (1976). During Bleckner's deposition, the following colloquy took place:

Q. Do you know who, if anyone, at 77 White Street Associates, actually managed the building?

A. Yes.

Q. Who was that?

A. Me.

Q. What were your duties as manager of the building?

A. I don't recall.

Q. Do you recall any of your duties?

A. Pay the bills.

Q. Other than paying the bills, who took care of the maintenance and repairs for the building in or about July of 1983, if anyone?

A. What maintenance and what repairs?

Q. Changing light bulbs, cleaning the hallways, taking out trash, locking the building, checking the boiler, turning on the heat, seeing that the roof was not leaking; whatever maintenance was required in the building, who did that?

A. Me.

Deposition of Ross Bleckner at 27–28 (Feb. 9, 1988).

During the *Gordon* trial, Bleckner further described his business activities:

I rented out these other floors as commercial studios, meaning they were

places that friends of mine could work and store the things that they made. That's on the second, third, fourth and fifth floors at what I considered to be a nominal rent to help defray the cost of running the building. On the ground floor also a friend of mine at that time and now opened up a framing shop which is just a place of business, a store front where he makes frames for drawings and makes the stretcher bars which are the structures that you stretch paintings over so that you can paint.

Transcript of testimony of Ross G. Bleckner in *Gordon v. Seventy-seven White Street Associates, et al.* at 141 [hereinafter Bleckner testimony]. Bleckner's arrangements with Justin Kelly confirm the undisputed fact that Bleckner supplemented his artist's income by managing the building he and his father owned. According to Bleckner, "I said that he [Kelly] can live there and work and instead of paying me rent he could do some work, some alterations, some renovations that had needed to be done for a long time." *Id.* at 143. Furthermore, Bleckner testified, "I told him that he should never use that elevator as a passenger elevator, that it was to be used to bring the equipment to do the work that I told him to do up and down because I had personally supervised his learning how to use the elevator." *Id.* at 145. Bleckner's testimony also established that the Mudd Club used the elevator to carry kegs of beer, musical instruments, and audio equipment, but never the club's patrons. *See id.* at 151–52. Bleckner was the manager of Seventy-seven White Street, and he used the building's freight elevator almost exclusively to fulfill his responsibilities as manager. Michael Gordon's accident was therefore covered by the business pursuits exclusion, and GAI did not breach the contract by not providing Bleckner with a defense. *See Shapiro, supra,* 365 N.Y.S.2d at 893 ("for purposes of the 'business pursuits' exclusion, the 'business' engaged in by [an insured] need not necessarily be limited to his *sole* occupation or employment") (emphasis in original).

■ GAI is entitled to summary judgment for a more significant reason. The contract between Bleckner and GAI provided that:

> In case of an accident or occurrence, the insured shall perform the following duties that apply. . . .
>
> a. give written notice to us or our agent as soon as practicable, which sets forth:
>
> . . . . .
>
> (2) reasonably available information on the time, place and circumstances of the accident or occurrence; and
>
> (3) names and addresses of any claimants and available witnesses;
>
> b. forward to us every notice, demand, summons or other process relating to the accident or occurrence.

*Contract, supra,* at 11 of 12. As Judge Tenney wrote for a unanimous panel of the Second Circuit in *Utica Mut. Ins. Co. v. Fireman's Fund Ins. Cos.,* 748 F.2d 118 (2d Cir.1984),

> Compliance with the notice requirements set forth in an insurance contract is a condition precedent to recovery under New York law, and failure by the insured to comply with such requirements relieves the insurer of liability.
>
> An insurance company is entitled to require notice at the earliest practicable time after a loss has occurred. Prompt notice permits the insurer to investigate the facts on which the claim is predicated and to adjust its books in order to maintain a proper reserve fund in light of the insured's claim. New York law permits an insurance company to assert the defense of non-compliance without showing that the lack of timely notice prejudiced the insurer in any way.

*Id.* at 121; *see also, e.g., Power Authority v. Westinghouse Elec. Corp.,* 117 A.D.2d 336, 502 N.Y.S.2d 420 (1986) (citations omitted) ("Without timely notice an insurer may be deprived of the opportunity to investigate a claim and is rendered vulnerable to fraud. Late notification may also prevent the insurer from providing a sufficient reserve fund. For these reasons, '[t]he right of an insurer to receive notice has been

held to be so fundamental that the insurer need show no prejudice to be able to disclaim liability on this basis.' ").

Ample New York case law supports the principles Judge Tenney described. In *Deso v. London & Lancashire Indem. Co. of Am.*, 3 N.Y.2d 127, 143 N.E.2d 889, 164 N.Y.S.2d 689 (1957), for example, the plaintiff fell down a flight of stairs and was told by his doctor that the mishap had caused serious injury to his back. A clause in the plaintiff's insurance contract required that "[w]hen an occurrence takes place written notice shall be given by or on behalf of the insured to the company or any of its authorized agents as soon as practicable." The plaintiff in *Deso* waited well over a month to forward notice to the defendant insurance company. The New York Court of Appeals wrote that "[i]t is unquestioned that a failure to satisfy the requirements of this clause by timely written notice vitiates the contract as to ... the insured...." Furthermore, "absent an excuse or mitigating circumstances, courts have assumed the function of determining fulfillment of the condition." Under the circumstances of the case, the court held, "[a]n unexcused delay of ['some fifty-one days'] constitutes a breach of condition as a matter of law". 3 N.Y.2d at 129–30, 143 N.E.2d at 891–92, 164 N.Y.S.2d at 691–92; *see also, e.g., Rushing v. Commercial Casualty Ins. Co.*, 251 N.Y. 302, 167 N.E. 450 (1929) (Cardozo, C.J.) (notice of accident forwarded twenty-two days after occurrence breached condition as a matter of law); *Haas Tobacco Co. v. American Fidelity Co.*, 226 N.Y. 343, 123 N.E. 755 (1919) (ten days).

Michael Gordon fell on July 22, 1983. He filed suit in January, 1984. GAI received a copy of the complaint and summons in *Gordon* on May 1, 1985. The trial of Gordon's case began on May 6, 1985. Bleckner puts forth no proof that he sent GAI or the insurance agent, at any earlier date, any written notice that he had been named a defendant in Gordon's lawsuit or that he expected to suffer any liability arising from the accident.[2] In fact, at a conference during the *Gordon* trial, held on the record before Justice Klein, Bleckner's attorney averred that the Horizon policy was the only insurance policy that definitely existed, and that there might be one other policy, with the Allied Insurance Co. She did not mention Bleckner's homeowner's policy with GAI.[3]

During his deposition, Bleckner was asked about his legal representation in *Gordon*. He answered that his lawyers in *Gordon* had been appointed for him, and although he did not remember exactly who had appointed them, he admitted that neither he nor Seventy-seven White Street Associates had paid any legal fees. Bleckner deposition, *supra*, at 41–43. Someone notified the partnership's insurer, and the insurer accordingly provided the Bleckners with a defense. "Plaintiff's decision to give timely notice to [one insurer] and not to [GAI] can only be viewed as an election to look to one source rather than another for reimbursement. Having made such a choice, plaintiff should not now be allowed to escape the consequences." *Power Authority v. Westinghouse Elec. Corp., supra*, 502 N.Y.S.2d at 423 (citations omitted). Here, Bleckner looked to Horizon, and not GAI, because he did not think that his homeowner's policy covered the freight elevator. By waiting a year and a half—until a few days before the *Gordon* trial began—to notify GAI of Gordon's suit, Bleckner prevented GAI from preparing for trial or handling his defense and thus frustrated the very purpose of the clause upon which he is suing. He thereby deprived himself of any recovery to which he

---

**2.** At his deposition in this action, Bleckner was asked, "Do you know whether or not any request was made on your behalf to the insurance company that had the homeowner's policy with you, to represent you in [the *Gordon*] litigation?" He answered "No." Bleckner deposition, *supra*, at 45.

**3.** The statements of Bleckner's attorney are admissible against him. Fed.R.Evid. 801(d)(2)(C) ("A statement is not hearsay if ... [t]he statement is offered against a party and is ... a statement by a person authorized by the party to make a statement concerning the subject").

might have been entitled.[4]

### B. *Punitive Damages for Breach of Contract*

■ GAI's motion papers do not deign specifically to address the sufficiency of Bleckner's second count. Nonetheless, the Court dismisses that count of its own accord. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 326, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986) ("district courts are widely acknowledged to possess the power to enter summary judgments *sua sponte* ").

> A New York court has written that
> [i]t is beyond cavil that a plaintiff cannot, in an action for breach of contract, recover damages for emotional distress. With respect to punitive damages, it has been consistently held that plaintiffs may not recover such damages without submitting factual allegations that defendant, in its dealings with the general public, engaged in a fraudulent scheme which demonstrates "such wanton dishonesty as to imply a criminal indifference to civil obligations." [Mere] "[a]llegations of breach of an insurance contract, even a breach committed willfully and without justification, are insufficient to authorize recovery of punitive damages."

*Fleming v. Allstate Ins. Co.*, 106 A.D.2d 426, 482 N.Y.S.2d 519 (1984) (citations omitted), *aff'd*, 66 N.Y.2d 838, 489 N.E.2d 252, 498 N.Y.S.2d 365 (1985), *cert. denied*, 475 U.S. 1096, 106 S.Ct. 1493, 89 L.Ed.2d 894 (1986). Bleckner filed this lawsuit two and one half years ago. His complaint states that the "actions of defendant were part and parcel of a scheme directed at the general public not to pay legitimate claims or delay their payment based on spurious, baseless and groundless defenses and purported exclusions." Complaint ¶ 11. Since that time, however, Bleckner has yet to adduce any evidence whatsoever of "wanton dishonesty" or other fraudulent intent. The facts of this case demonstrate that Bleckner's charge that GAI was criminally indifferent to its civil obligations is, to put it charitably, frivolous. The second count of the plaintiff's complaint is accordingly dismissed.

### C. *Sanctions Under Rule 11*

Rule 11 of the Federal Rules of Civil Procedure provides, in pertinent part, that

> Every pleading, motion, and other paper of a party represented by an attorney shall be signed.... The signature of an attorney ... constitutes a certificate by the signer that the signer has read the pleading, motion, or other paper; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of the litigation.... If a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, shall impose upon the person who signed it ... an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee.

Fed.R.Civ.P. 11.

In *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243 (2d Cir.1985), *modified*, 821 F.2d 121 (2d Cir.), *cert. denied*, —— U.S. ——, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987), the Second Circuit noted that the 1983 amendment to rule 11 "explicitly and

---

**4.** It is also worth noting that Fred Bleckner, the plaintiff's father, paid all of the five hundred thousand dollars that the partnership proffered in settlement of the *Gordon* case. There is no claim that Ross Bleckner paid the Gordons a single penny. *See* Bleckner deposition, *supra,* at 61. Thus, even if GAI did not comply with its contractual obligation to "provide a defense at [its] expense by counsel of [its] choice," it could not have breached its duty to "pay up to [its] limit of liability for the damages for which [Ross Bleckner was] legally liable"—because the stipulation and confession of judgment signed in that case omitted Ross Bleckner from those legally liable.

unambiguously imposes an affirmative duty on each attorney to conduct a reasonable inquiry into the viability of a pleading before it is signed." *Id.* 108 S.Ct. at 253; *see also Calloway v. Marvel Entertainment Group,* 854 F.2d 1452 (2d Cir.1988), *cert. granted,* —— U.S. ——, 109 S.Ct. 1116, 103 L.Ed.2d 179 (1989); Schwarzer, "Rule 11 Revisited," 101 *Harv.L.Rev.* 1013, 1021 (1988) (The "prefiling investigation ... makes lawyers 'stop and think' before they file papers.... It forces them to consider whether the facts found and the law developed justify the risks and costs that will follow from filing a paper."). If the subject of sanctions is a lawyer, rather than a party, district courts should apply "an objective standard, focusing on what a reasonably competent attorney would believe." *Greenberg v. Hilton Int'l Co.,* 870 F.2d 926, 934 (2d Cir.1989) (citing *Eastway, supra,* 762 F.2d at 253). When the sanctions are to be imposed for alleging claims purportedly not well-grounded in fact, "the initial focus of the district court should be on whether an objectively reasonable evidentiary basis for the claim was demonstrated in pretrial proceedings." *Calloway,* 854 F.2d at 1470. When the sanctions are for claims not warranted by law, a court should impose them when "it is patently clear that a claim has absolutely no chance of success under the existing precedents, and where no reasonable argument can be advanced to extend, modify, or reverse the law as it stands." *Macmillan, Inc. v. American Express Co.,* 125 F.R.D. 71, 78 (S.D.N.Y.1989) (quoting *Eastway,* 762 F.2d at 254). As the advisory committee for the 1983 amendment explained, "[g]reater attention by the district courts to pleading and motion abuses and the imposition of sanctions when appropriate should discourage dilatory or abusive tactics and help to streamline the litigation process by lessening frivolous claims or defenses." Fed.R.Civ.P. 11 advisory committee's note. *See generally* T.E. Willg-ing, *The Rule 11 Sanctioning Process* 19–33 (Federal Judicial Center 1988) (discussing "Purposes of Amended Rule 11 as Seen by Drafters and Users").

In its moving papers, GAI stated that it sought sanctions because "the action was brought in bad faith, with knowledge that Ross Bleckner did not have a valid claim either in the law or on the facts." Affirmation of Joel Lieber at 10 (May 31, 1988); *cf. Sanko S.S. Co. v. Galin,* 835 F.2d 51 (2d Cir.1987); *see* T.E. Willging, *supra,* at 91–96. This Court agrees that the defendant's lawyers deserve sanctions for filing this claim. Any reasonably competent attorney would have discovered the abundance of New York cases construing standard form notification clauses, and it is patently obvious that given the facts of his case against GAI, Bleckner had "absolutely no chance of success under the existing precedents." Neither did the plaintiff's counsel choose to advance any "reasonable argument ... to extend, modify, or reverse the law as it stands." Furthermore, Bleckner's lawyers offered no "objectively reasonable evidentiary basis for the claim" that GAI deserved punishment for "wanton dishonesty." Because the plaintiff's lawyers have violated Fed.R.Civ.P. 11, the Court must impose an appropriate sanction.

However, in accordance with the due process principles underlying rule 11, *see* Fed.R.Civ.P. 11 advisory committee's note, the plaintiff's counsel is entitled to notice and an opportunity to be heard.[5] GAI notified Bleckner's lawyers on May 31, 1988, when it first moved for summary judgment, that it sought sanctions under rule 11. Despite enjoying almost a year's notice, the plaintiff's counsel apparently chose not to respond. *See* Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment and Sanctions and in Support of Plaintiff's Motion for Partial Summary Judgment (Aug. 4, 1988) (notwithstanding

---

5. Consideration of the papers so far submitted, without more, might well satisfy the requirements of due process. *Cf. Oliveri v. Thompson,* 803 F.2d 1265, 1280 (2d Cir.1986) (due process "does not mean, necessarily, that an evidentiary hearing must be held.... Here, 'the judge's participation in the proceedings provide[d] him with full knowledge of the relevant facts.' "); Fed.R.Civ.P. 11 advisory committee's note ("The particular format to be followed should depend on the circumstances of the situation and the severity of the sanction under consideration"); *see* T.E. Willging, *supra,* at 99–100 & nn. 231–32.

its title, ten page memorandum of law did not address motion for sanctions); Plaintiff's Reply Affidavit (Feb. 17, 1989). The plaintiff's counsel is nonetheless invited to submit affidavits and other writings, including a memorandum of law, by June 5, 1989, explaining why sanctions under rule 11 might not be warranted. The defendant's counsel shall submit to the Court by June 5, 1989, a schedule of its costs in defending this lawsuit, along with any other information relevant to the Court's "careful calibration" of an assessment consistent with rule 11's "sanctioning purposes." *Eastway*, 821 F.2d at 122; *cf. Calloway, supra* (one hundred thousand dollars in sanctions found appropriate; district judge considered "the gravity of the rule 11 violation, the circumstances of the violation within the context of the case, and the financial resources of the respective parties"); *cf. also Brown v. Federation of State Medical Bds.*, 830 F.2d 1429, 1438 (7th Cir.1987) ("Compensation, though an important consideration, is not the only purpose underlying Rule 11. An even more important purpose is deterrence.").

### Conclusion

The plaintiff's motion for summary judgment is denied. The defendant's motion for summary judgment is granted as to both counts in the plaintiff's complaint. The defendant's motion for sanctions under Fed.R.Civ.P. 11 is conditionally granted, pending further written submissions, with the amount of the sanction to be determined by the Court at a later date.[6]

IT IS SO ORDERED.

### ON MOTION TO VACATE

In an Opinion and Order dated May 15, 1989, this Court granted the defendant's motion for summary judgment and denied the plaintiff's cross motion for summary judgment, and conditionally granted the defendant's motion for sanctions. The Court then invited the plaintiff's counsel to submit affidavits and a memorandum of law explaining why sanctions might not be warranted. In their submissions, Bleckner's

6. *See* T.E. Willging, *supra,* at 100 & n. 235.

counsel moved to vacate each of the three parts of the order. For the following reasons, the motion is denied in its entirety.

The Court granted GAI's motion and denied Bleckner's cross motion because there were no genuine issues of material fact and GAI was entitled to judgment as a matter of law on two defenses: first, because the "business pursuits" clause covered Bleckner's work as manager of Seventy-seven White Street; and second, because Bleckner breached the contract's notice requirements. The prior opinion fully discusses the business pursuits clause and its analysis will not be repeated.

Bleckner's lawyers correctly note that GAI did not mention the second ground in its letter of June 18, 1985, denying Bleckner coverage. They then argue that in denying Bleckner coverage on one ground, GAI is estopped from asserting another ground as a defense. In support, the plaintiff's counsel cite *Guberman v. William Penn Life Ins. Co.*, 146 A.D.2d 8, 538 N.Y.S.2d 571 (2d Dep't 1989), quoting in full a paragraph in which the court wrote, "for example, an insurer which disclaims liability solely on the basis of its insured's failure to cooperate may be estopped from later disclaiming on the basis of the insured's failure to provide a timely notice of its claim," 538 N.Y.S.2d at 573.

Conspicuous in its absence from the moving brief is the succeeding paragraph of the Appellate Division's opinion. It reads as follows:

The vast majority of jurisdictions recognize, however, that *this rule of estoppel is limited in its application to those instances where the insured has suffered some degree of prejudice as a result of the insured's attempt to shift its defense from one basis to another.* This rule of estoppel "has its limitations and exceptions, which are as clearly established as the rule itself, one of which is that before the rule can apply it must appear that claimant was misled to his injury."

*Id.* (citations omitted; emphasis added). Justice Bracken then continued:

In our opinion, the above stated limitation to the application of the estoppel rule is well founded, and there is nothing in New York precedent which compels us to conclude that it does not apply in this State. While it is true that an insurer's specification of one of several available grounds for disclaimer may be taken by the insured as an indication that the other grounds have been overlooked, as a basic matter of fairness we see no reason why this circumstance should operate to bar the later assertion of the other grounds for disclaimer where the insured cannot claim to have suffered any degree of prejudice. The overwhelming majority of American jurisdictions refuse to impose this sort of estoppel in the absence of prejudice, and it is clear that the rule as formulated continues to be valid.... This approach is consistent with the general rule that an equitable estoppel will be imposed so as to prevent a litigant from asserting a defense only where it is necessary to prevent prejudice.

*Id.* at 573–74 (citations omitted). Bleckner's attorneys have proffered no example of any prejudice their client may have suffered, and it is difficult to imagine how they could. As the undisputed facts of this case reveal, another insurer paid in full for the legal representation Ross Bleckner enjoyed at the trial of *Gordon v. Seventy-seven White Street Associates,* and when the parties settled, Bleckner's father, not Bleckner, laid out the entire sum agreed upon. The plaintiff's lawyers knew those facts when they filed their complaint in this suit. The plaintiff has suffered no prejudice, and estoppel, therefore, does not lie. Summary judgment was properly entered on the grounds set forth above.

■ Rule 11 provides that the "signature of an attorney constitutes a certificate by the signer that the signer has read the [paper and] that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law, and that it is not interposed for any improper purpose." Fed.R.Civ.P. 11. As the Second Circuit recently stressed, and as the May 15 opinion made clear,

Rule 11 mandates sanctions where it is clear that: (1) a reasonable inquiry into the basis for a pleading has not been made; (2) under existing precedents there is no chance of success; and (3) no reasonable argument has been advanced to extend, modify or reverse existing law. The Rule "explicitly and unambiguously imposes an affirmative duty on each attorney to conduct a reasonable inquiry into the validity of a pleading before it is signed." This requirement assures that lawyers are prepared to demonstrate that they have done the necessary investigation prior to appearing in court.

*International Shipping Co. v. Hydra Offshore, Inc.,* 875 F.2d 388, —— (2d Cir. 1989) (quoting *Eastway Constr. Corp. v. City of New York,* 762 F.2d 243, 253 (2d Cir.1985), *modified,* 821 F.2d 121 (2d Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987)). Bleckner's lawyers persist in arguing that they acted appropriately in filing their complaint. As to the first count, however, any reasonable prefiling inquiry would have uncovered the New York precedents limiting equitable estoppel to instances where the plaintiff suffered some prejudice. *See Guberman, supra,* 538 N.Y.S.2d at 574.[1] And as to the second count, any inquiry, reasonable or slapdash, would have shown there was no factual basis for the allegation that GAI acted with "wanton dishonesty." Bleckner's lawyers offered no argument at all for the extension, modification, or reversal of existing New York law. Because the plaintiff's

---

**1.** *Guberman* merely reaffirmed existing New York law: Justice Bracken cited, among other cases, *Brink v. Hanover Fire Ins. Co.,* 80 N.Y. 108 (1880), decided in 1880; *Kiernan v. Dutchess County Medical Center,* 150 N.Y. 190, 44 N.E. 698 (1896), decided in 1896; and *Shichman v.* *Commercial Travelers Mut. Accident Ass'n of Am.,* 267 A.D. 389, 46 N.Y.S.2d 32 (1944), decided in 1944. *See also Whiting Corp. v. Home Ins. Co.,* 516 F.Supp. 643, 646 (S.D.N.Y.1981) (Goettel, J.). Of course, the roots of equitable estoppel go back much further.

lawyers have violated rule 11, the Court must impose upon them sanctions. *Yosef v. The Passamaquoddy Tribe,* 876 F.2d 283, 287 (2d Cir.1989) ("The revised Rule 11 states emphatically that the court 'shall' impose sanctions whenever a violation of the rule is discerned.").

Rule 11 provides that a district court shall impose "an *appropriate* sanction." Fed.R.Civ.P. 11 (emphasis added). The sanction may, but need not, include "an order to pay to the other party ... the amount of the reasonable expenses incurred, ... including a reasonable attorney's fee." *Id.; see Eastway Constr. Corp., supra,* 821 F.2d at 125 (Pratt, J., dissenting).[2] Fee shifting in this case is unwarranted; GAI's attorneys themselves missed many of the legal issues raised and in any event spent little effort defending against the second count. Indeed, the rule 11 violations in this case flowed less from bad faith than carefree lawyering. Bleckner's attorneys have wasted judicial resources that could have been used for the resolution of meritorious claims. An appropriate sanction should compensate the federal courts.[3]

The plaintiff's counsel shall undertake the representation of a pro se plaintiff by choosing one case from among those with a docket number bearing the initials "RPP" and listed in the June 1, 1989 pamphlet circulated for members of the Pro Bono Panel of the United States District Court for the Southern District of New York.[4] They shall submit a notice of appearance in the case they select no later than July 3, 1989.

The plaintiff's motion to vacate the Opinion and Order of May 15, 1989 is denied, and this action is hereby dismissed.

IT IS SO ORDERED.

---

**2.** [C]ongress intended to make available in the universe of sanctions an attorney's fee as but one example of a wide array of possible monetary and nonmonetary sanctions. Some examples of nonmonetary sanctions might include requiring continuing legal education course work in areas of acute deficiency; in extreme cases, recommending disciplinary action by the bar; or something as simple as a judicial reprimand, whether rendered in private, in open court, or in a published opinion. *Eastway Constr. Corp., supra,* 821 F.2d at 125 (Pratt, J., dissenting); *see also* T.E. Willging, *supra,* at 127 ("The options available to a district judge in tailoring a sanction for a given case seem limited only by the judge's imagination and the possibility of appellate review under an abuse-of-discretion standard."); *id.* at 128–31; *International Shipping v. Hydra Offshore, supra,* 875 F.2d at 392.

**3.** *Cf. Cooper v. A. Sargenti Co.,* 877 F.2d 170, 172–73 (2d Cir.1989).

**4.** *Cf. Mallard v. United States Dist. Court for the Southern Dist. of Iowa,* —— U.S. ——, 109 S.Ct. 1814, 104 L.Ed.2d 318 (1989) (5–4 decision) (28 U.S.C. § 1915(d), which allows district courts to "request" lawyers to represent indigent parties in civil cases, does not empower them to require pro bono service). *But cf. id.* at 1821 n. 6; and see Justice Stevens' dissenting opinion and the citations therein.