Power Authority of the State of New York, Respondent-Appellant, v Westinghouse Electric Corporation et al., Defendants, and Mission Insurance Company, Appellant-Respondent.

First Department, May 20, 1986

### APPEARANCES OF COUNSEL

*Bradley Prozeller* of counsel *(Franklin B. Velie* with him on the brief; *Christy & Viener,* attorneys), for respondent-appellant.

*Benjamin. A. Fleischner* of counsel *(White, Fleischner & Fino,* attorneys), for appellant-respondent.

### OPINION OF THE COURT

Murphy, P. J.

In January 1980, an electrical transformer owned by plaintiff Power Authority of the State of New York and operated at the Power Authority's Gilboa, New York, plant failed. Arrangements were thereafter made to ship the transformer weighing 315,000 pounds and measuring 16 feet in height by 22 feet in length and 11 feet in width to defendant Westinghouse's St. Louis, Missouri, plant for repairs. Defendant Higgins Erectors and Haulers was engaged to bring the transformer to and from the railroad siding at Richmondville, New York. Transport between Richmondville and St. Louis was to be provided by defendant Delaware and Hudson Railway Company.

An all-risk transit loss policy was taken out by plaintiff through its insurance broker Ter Bush & Powell with defendant Mission Insurance Company to insure the transformer

against damage incurred during travel to and from St. Louis. Mission's liability under the policy was not to exceed $1,100,000. So far as is here relevant, the policy provided "The insured shall as soon as practicable report in writing to the Company or its agent every loss, damage or occurrence which may give rise to a claim under this policy".

Following Westinghouse's completion of repairs and tests confirming that the transformer was restored to working order, the transformer was returned to plaintiff's Gilboa plant where it was initially tried on January 2, 1981 and found inoperable. The problem was attributed to a short between the transformer's core and core clamping. Although a sensor attached to the transformer during transit indicated that the ride from St. Louis had been relatively smooth, visual inspection conducted between January 8 and 15 revealed that the transformer's C phase tap changer had slid out of place and had broken one of the ground bonds between the various core clamping bolts. As of January 12, Philip Zorda, a supervisor at the Gilboa plant, was directed to keep a daily log of work done on the transformer.

Responding to plaintiff's request for assistance, Westinghouse personnel arrived at the Gilboa plant on January 15. Because the transformer could not be repaired while still in its casing, a decision was taken to remove the cover or to "detank" the transformer, which process was to be photographically documented. Removal of the cover disclosed that the transformer core was displaced and that the blocks supporting it had dropped out of position. On January 16, high voltage was employed to try to correct the previously discovered short.

The following day it was decided that a representative of the Delaware and Hudson Railway should be present to witness the continuing de-tanking process. Mr. J. H. Miller, a railroad inspector, arrived at plaintiff's plant on January 19, whereupon he was advised by Mr. Charles Lipsky, the power project Superintendent, that in his (Lipsky's) opinion, the transformer had been damaged in transit.

Repairs continued until February 9 when plaintiff filed a written claim with the railway. The claim stated: "On its arrival at the project, inspection revealed that the shipment had been subjected to damage."

When two more attempts by Westinghouse during February and March to correct the short proved futile, a decision was made on April 15, 1981, to return the transformer to the

Westinghouse facility in Missouri. It is at this time that plaintiff admits concluding that the transformer's inoperability constituted a loss of the sort covered by its insurance policy with Mission. Nevertheless, no steps were taken to notify Mission of the loss until May 11 when Mr. Frank Deeg, the power Authority insurance manager, phoned Ter Bush & Powell and requested that notice be forwarded to Mission. Not until June 8, 1981, did Ter Bush & Powell send written notification to Mission's agents, Sayre & Toso. In the meantime, on May 1, 1981, the transformer was loaded onto a trailer for reshipment to St. Louis. On May 15 it was put aboard the train and it arrived at the Westinghouse facility on June 3, 1981, where an investigative teardown commenced at once.

Defendant Mission has disclaimed liability under the policy on the ground that it was not afforded timely notice of loss. Plaintiff in response commenced the instant action to recover pursuant to the policy. At issue on this appeal is whether Mission's motion for summary judgment dismissing the action against it, denied by Special Term, should have been granted based upon Mission's disclaimer. Put somewhat more specifically, the issue is whether it can be said as a matter of law that notice of loss was not given by plaintiff within a reasonable time.

An insurer's obligation to cover its insured's loss is not triggered unless the insured gives timely notice of loss in accordance with the terms of the insurance contract. *(Security Mut. Ins. Co. v Acker-Fitzsimons Corp.,* 31 NY2d 436 [1972]; *Allstate Ins. Co. v Furman,* 84 AD2d 29 [2d Dept 1981], *affd* 58 NY2d 613 [1982].)* Without timely notice, an insurer may be deprived of the opportunity to investigate a claim and is rendered vulnerable to fraud. Late notification may also prevent the insurer from providing a sufficient reserve fund. *(See, Utica Mut. Fire Ins. v Fireman's Fund Ins. Cos.,* 748 F2d 118, 121 [2d Cir 1984].)* For these reasons, "[t]he right of an insurer to receive notice has been held to be so fundamental that the insurer need show no prejudice to be able to disclaim liability on this basis" *(Allstate Ins. Co. v Furman, supra,* at p 33).

Notice provisions such as the one at issue have been uniformly interpreted to require that notice be given within a reasonable time under the circumstances. *(Jenkins v Burgos,* 99 AD2d 217, 220 [1st Dept 1984].)* Although what is reasonable is ordinarily left for determination at trial, where there is no excuse for the delay and mitigating considerations are

absent, the issue may be disposed of as a matter of law in advance of trial. *(Jenkins v Burgos, supra.)* Relatively short periods of unexcused delay have been found unreasonable as a matter of law. *(See, e.g., Deso v London & Lancashire Indem. Co.,* 3 NY2d 127 [51 days]; *Rushing v Commercial Cas. Ins. Co.,* 251 NY 302 [22 days]; *Haas Tobacco Co. v American Fid. Co.,* 226 NY 343 [10 days].) A review of the record in this case discloses no mitigating factor or excuse for plaintiff's delay in notifying defendant Mission Insurance Co. of its loss. Accordingly, Mission is entitled to summary judgment dismissing the complaint against it.

Initially, it should be observed that the notice provision in the subject policy unambiguously requires that the "insured shall as soon as practicable report in writing to the Company or its agent *every loss, damage or occurrence which may give rise to a claim"* (emphasis added). No exception is made for losses which appear insubstantial or which in the insured's estimation may not ultimately ripen into a claim. The import is clear; all losses are to be reported as soon as practicable if they are to become the basis of a claim. When the insured indefinitely reserves to itself the determination of whether a particular loss falls within the scope of coverage, it does so at its own risk. *(See, Utica Mut. Fire Ins. Co. v Fireman's Fund Ins. Cos.,* 748 F2d 118, 121, *supra.)*

Plaintiff was informed that the transformer had been successfully tested just prior to its return shipment from Westinghouse. Nevertheless, plaintiff's initial tests, performed as early as January 2, 1981, indicated that the transformer was inoperable. A short was diagnosed and visual inspection disclosed obvious damage. Surely, the possibility that the transformer had been damaged in transit must have been considered among the most likely explanations for its inoperability. A strong argument may, therefore, be made that plaintiff's duty to report its loss arose in early January 1981.

There is no support in the record for plaintiff's contention that it considered the damage to the transformer insignificant, nor is it relevant since plaintiff was obliged to report "every loss, damage or occurrence" possibly giving rise to a claim. In any case, plaintiff's actions belie its attempts to minimize its assessment of the damage. Plaintiff's resident manager, Jack Collyer, took the unusual step of having a daily log kept of work performed on the transformer and the assistance of expert Westinghouse personnel was promptly sought. The detanking of the transformer, a major operation apparently

unnecessary but for the need to assess internal damage, also points to the conclusion that plaintiff did not consider the damage minor and attempts to repair it were far from routine.

Any doubts on this score or concerning plaintiff's conclusion as to the cause of the damage should be put to rest by plaintiff's decision to notify the railway of the de-tanking procedure. It will be recalled that on the railway inspector's arrival power project Superintendent Lipsky informed him that in his (Lipsky's) view the damage occurred during transport. At his deposition Lipsky explained the obvious basis for his opinion: "Making the assumption that the transformer was moved out of the Westinghouse facility intact and the fact that it arrived at the project with internal displacement of components, I only had—I could only draw one conclusion, that it occurred between the time it left Westinghouse and arrived at the project."

Acting on this all but inevitable conclusion and on the additional evidence of internal damage to the transformer gathered as the de-tanking progressed, the Power Authority filed written notice with the railway on February 9, 1981 asserting a claim for damage to the shipment. Plaintiff claims it was coerced into making the claim against the railway by Westinghouse, but this allegation is utterly without basis in the record. Indeed, as Superintendent Lipsky candidly observed: "For the protection of the Power Authority, I felt it [filing the notice of claim against the railway] was an action that had to be taken."

It should be clear beyond all doubt that as of February 9, 1981, at the very latest, plaintiff had an obligation to notify Mission of the damage to the transformer. Circumstances giving rise to a claim against the railroad would by definition come within the scope of Mission's all-risk transit policy. There is, in fact, no apparent reason why Mission should have been treated differently from the railway. Like the railway, it should have been notified of the de-tanking and thereby afforded an opportunity to conduct an early investigation as to the extent and cause of the transformer damage before the evidentiary trail was obscured by plaintiff's extensive in-house repair efforts. Plaintiff's decision to give timely notice to the railway and not to Mission can only be viewed as an election to look to one source rather than another for reimbursement. (Cf. *Gardner-Denver Co. v Dic-Underhill Constr. Co.*, 416 F Supp 934, 937 [SDNY 1976].) Having made such a choice,

plaintiff should not now be allowed to escape the consequences.

Even if there is any residual doubt regarding Mission's right to notification as of February 9, which there should not be, plaintiff admits that on or about April 15, 1981, it reached the conclusion that the "inoperability [of the transformer] constitutes a loss as that term is used in the policy". This belated conclusion notwithstanding, written notice of loss was not afforded Mission for another 53 days. This unexplained delay alone would warrant judgment for Mission as a matter of law *(see, Deso v London & Lancashire Indem. Co., supra; Rushing v Commercial Cas. Ins. Co., supra; Haas Tobacco Co. v American Fid. Co., supra)* even if it were not preceded by 3½ months of similarly unaccounted for delay.

Although Mission need not show prejudice to prevail *(see, e.g., Allstate Ins. Co. v Furman, supra,* at p 33), the highly prejudicial conduct of plaintiff should not go unnoticed. As noted above, plaintiff improperly failed to advise Mission of its intention to de-tank and dismantle the transformer for the purpose of attempting involved in-house repairs. What is even more remarkable, however, is that by the time notice was finally given on June 8, 1981, the transformer had already been returned by train to Westinghouse and disassembled. Thus, the transformer was again subjected to the very risk which plaintiff now claims caused the transformer's damage in the first place. Plainly, any remaining opportunity for Mission to conduct an independent investigation of plaintiff's claim was foreclosed by plaintiff's actions subsequent to the time that the notice obligation indisputably arose and prior to the time notice was actually given. Where, as here, the insured has acted in a manner so palpably prejudicial to the insurer there should be no question whatsoever as to whether the delay is excusable; it is not.

There are no mitigating or extenuating factors here. Plaintiff is not a severely injured individual unsophisticated in insurance matters being kept from his or her only source of recovery by a draconian application of law. *(See, e.g., Allstate Ins. Co. v Alford,* 14 AD2d 650 [3d Dept 1961].) Plaintiff is a large power authority with its own insurance manager. Its damage is purely economic and it in no way interfered with its capacity to learn of the loss or of the fact of coverage, as might a personal injury. Even if the complaint is dismissed as to Mission, plaintiff will still be able to pursue its causes for

reimbursement against Westinghouse, the railroad, and Higgins Erectors and Haulers.

There is no triable issue concerning the essential facts in this case. When the record is viewed most favorably to plaintiff one can gather only that plaintiff's duty to notify Mission of its loss arose at the very latest on April 15, 1981, but that notice was withheld for 53 days thereafter, during which time plaintiff acted in a manner grossly prejudicial to Mission's right to investigate the claim. As there is no basis for excusing plaintiff's delay, it must be deemed unreasonable as a matter of law. *(See, Jenkins v Burgos, supra,* at p 220.)

Accordingly, the order of the Supreme Court, New York County (Alfred M. Ascione, J.), entered on or about December 7, 1984 which denied both plaintiff Power Authority of the State of New York's motion and defendant Mission Insurance Company's cross motion for summary judgment, but which granted said defendant's motion to serve an amended answer alleging lack of timely notice and lack of coverage under the subject insurance policy, modified, on the law, with costs, defendant Mission Insurance Company's motion for summary judgment dismissing the complaint against it is granted, and, except as modified, affirmed.

The appeal from the order of the same court entered August 30, 1985, which denied defendant Mission Insurance Company's motion for reargument and renewal should be dismissed as moot.

KUPFERMAN, ROSS, MILONAS and ELLERIN, JJ., concur.

Order, Supreme Court, New York County, entered on or about December 7, 1984, unanimously modified, on the law, defendant Mission Insurance Company's motion for summary judgment dismissing the complaint against it is granted, and, except as modified, affirmed. Defendant-appellant-respondent shall recover of plaintiff-respondent-appellant one bill of $75 costs and disbursements of this appeal. The appeal from the order entered on August 30, 1985 is unanimously dismissed as moot.