630 A.2d 261

COMMERCIAL UNION INSURANCE COMPANY

v.

PORTER HAYDEN COMPANY.

No. 760, Sept. Term, 1992.

Court of Special Appeals of Maryland.

June 30, 1993.

Certiorari Granted Dec. 21, 1993.

Theodore A. Howard (Richard H. Gimer, Richard A. Ifft and Hopkins & Sutter, on the brief) Washington, DC, for appellant.

Louis G. Close, Jr. and Leigh Swann Halstad (Lisa A. Kershner and Whiteford, Taylor & Preston, on the brief) Baltimore, for appellee.

Argued before BLOOM, WENNER and HARRELL, JJ.

HARRELL, Judge.

On 21 September 1990, Porter Hayden Company (Porter Hayden), appellee/cross-appellant, filed a complaint in the Circuit Court for Baltimore City, seeking a declaration of the duty of Commercial Union Insurance Company (Commercial Union), appellant/cross-appellee, to defend and potentially to indemnify Porter Hayden in connection with certain asbestos liability lawsuits filed against Porter Hayden. The parties filed competing motions for summary judgment and partial summary judgment with respect to numerous issues raised in the litigation. After hearings in January 1992, the circuit court, on 14 February 1992, issued a series of decisions and orders that resolved the summary judgment motions in favor of Porter Hayden. On 12 March 1992, the circuit court modified its rulings in certain respects pursuant to Commercial Union's motions to alter or amend the judgment. The court entered final judgment on the same date. These appeals followed.

## FACTS

Porter Hayden is a Maryland Corporation that was formed in 1966 upon the merger of its predecessors, H.W. Porter &

Company, Inc., a New Jersey corporation, and Reid Hayden, Inc., a Maryland corporation.[1] Since the 1920's, Porter Hayden has been an insulation contractor that sells and installs insulation in industrial facilities located in the Mid–Atlantic region. Until some time in the 1970's, these insulation products contained asbestos.

In August 1976, the first of what were to become many lawsuits alleging bodily injury from exposure to asbestos-containing insulation products was filed against and served upon Porter Hayden. Upon receipt of service of this initial lawsuit, Porter Hayden, by way of letter from its counsel, directed its insurance broker to give notice of the suit to whichever of Porter Hayden's various liability insurers that were "properly chargeable with the defense under [its] policy obligations."

Commercial Union was not one of the insurers subsequently contacted by the broker; it is not clear from the record whether Commercial Union was "properly chargeable" with Porter Hayden's defense in the initial lawsuit. In any event, Commercial Union did not receive actual notice of any asbestos-related litigation involving Porter Hayden until early August 1978. At that time, Employers Insurance of Wausau, Porter Hayden's then comprehensive general liability (CGL) insurer, informed Commercial Union of a pending asbestos lawsuit against Porter Hayden and requested that Commercial Union acknowledge that its policy or policies would provide coverage for Porter Hayden for the claims of alleged exposure to asbestos during the Commercial Union policy periods. Shortly thereafter, by letter dated 8 August 1978, Porter Hayden requested that Commercial Union participate in Porter Hayden's defense. It based its request on its assertion that Commercial Union's predecessor-in-interest, the Employers' Liability Assurance Corporation, Ltd. (ELAC), provided standard CGL insurance coverage from 1951 to 1952 under policy number CL–234270.

---

1. Throughout this opinion, we use "Porter Hayden" to refer to the Porter Hayden Company and its predecessors.

In a letter dated 16 August 1978, Commercial Union responded to Porter Hayden's request by indicating that it was unable to confirm through its home office that ELAC insured Porter Hayden for the time period and under the policy referred to by Porter Hayden. On 25 August 1978, Porter Hayden renewed its request for a defense and provided Commercial Union with a copy of an insurance certificate indicating CGL coverage under ELAC policy CL–234270 for the policy period 25 November 1951 to 25 November 1952. Commercial Union responded in writing on 18 September 1978, stating that it required a copy of the declarations page of the policy to determine whether Porter Hayden had purchased coverage from ELAC for products liability claims, because that information was not available on the insurance certificate. Thus, while Commercial Union did not deny that there was standard CGL coverage during the 1951–52 policy period, it did indicate to Porter Hayden that it could not affirm the existence of coverage for the subject claims absent evidence that Porter Hayden had purchased "products hazard" coverage as insurance against products liability claims.

Porter Hayden subsequently produced two ELAC policies for the periods of 25 November 1948 to 25 November 1949 and 25 November 1949 to 25 November 1950 (the 1949 and 1950 policies). These policies afforded coverage for liability in damages to third parties for bodily injury, sickness, or disease arising from Porter Hayden's "operations" during the policy periods. The policies clearly indicated that Porter Hayden had not obtained "products hazard" coverage.

Over the next approximately two years, the parties exchanged numerous letters. In these letters, Porter Hayden insisted that Commercial Union was obligated to share in the defense against the asbestos-related lawsuits.[2] Commercial

---

**2.** During this time, Porter Hayden was unable to produce further documentation that demonstrated the existence of coverage provided by ELAC in parts of the 1940's and 1950's. The company stated, however, that the records of the Maryland Workers' Compensation Commission clearly reflected that ELAC was Porter Hayden's insurer from 25 November 1941 to 24 January 1953. The assertion implicit in Porter

Union repeatedly rejected Porter Hayden's position on the ground that there was no evidence that the company carried products liability coverage during the relevant time period.

In November 1980, Porter Hayden sent to each of its primary and excess liability carriers from 1945 to 1980 copies of all of the asbestos-related complaints that it had received since 1976. Porter Hayden indicated in correspondence to these carriers that it expected them to assume their obligations under their insurance policies and participate in Porter Hayden's defense. Commercial Union was one of the carriers so notified.

In July 1982, the Hartford Accident and Indemnity Company, which also was one of Porter Hayden's carriers at some time during the 1945–1980 time frame, instituted a declaratory judgment action against Porter Hayden and its other primary carriers, including Commercial Union. Hartford sought a declaration that, to the extent that Porter Hayden could establish that Hartford had provided products liability coverage, Hartford would be obligated to pay only a pro rata share of the indemnity and defense costs, subject to the terms and conditions of the policy. But before this action proceeded further, the parties to the Hartford action entered into an "Agreement" (the Hartford Agreement or the Agreement), effective 1 November 1982, pursuant to which they agreed (1) to share, on an interim basis, in Porter Hayden's defense in pending and anticipated asbestos-related tort suits and (2) that the Hartford action would be stayed until 1 March 1985. The parties explicitly and fully reserved their claims and defenses with regard to the coverage litigation. During the pendency of the Agreement, the parties stipulated to repeated extensions of the time to plead in the Hartford action, with the last extension expiring on 31 March 1987. The Agreement

Hayden's offering of that information was that, because ELAC was Porter Hayden's workers' compensation insurer during that period, ELAC also provided the insulation company's other insurance needs for the same period.

expired as between Commercial Union and Porter Hayden on 31 December 1986.[3]

The dispute between Commercial Union and Porter Hayden regarding the insurance company's alleged duty to defend resumed later in the summer of 1987. On 31 August 1987, Porter Hayden sent copies of five additional asbestos-related complaints filed against and served upon it to Commercial Union and requested the insurer to defend and indemnify Porter Hayden in each case. The plaintiffs in these lawsuits asserted claims for damages against numerous asbestos manufacturers, suppliers, and insulation installers based on several theories of tort liability set forth in the "Master Complaint." [4]

Commercial Union responded on 18 September 1987. In denying Porter Hayden's request, Commercial Union once again noted, among other things, Porter Hayden's lack of products hazard coverage. In the insurer's view, the standard CGL policies that covered Porter Hayden in the 1940's and 1950's did not apply to the exposure to asbestos products alleged by the plaintiffs in the 1987 lawsuits.

Porter Hayden instituted a declaratory judgment action against Commercial Union on 21 September 1990. This complaint sought declarations of insurance coverage with respect to: (1) the five asbestos cases tendered to Commercial Union in August 1987; and (2) "such other personal injury cases" filed against Porter Hayden "which may be tendered" to Commercial Union, excluding cases filed before 1 January 1987. The complaint also requested reasonable attorneys' fees and expenses.

Beginning in September 1991, the parties sought summary relief as to numerous issues in the case. Porter Hayden

---

3. The Hartford action was dismissed without prejudice in May 1988, pursuant to Md.Rule 2–507, for lack of prosecution.

4. The use of the Master Complaint in asbestos-related tort lawsuits was mandated by order of the Circuit Court for Baltimore City on 17 February 1987 as part of an overall plan for the handling of more than 8500 consolidated asbestos-related claims in Baltimore City.

moved for partial summary judgment on the issue of Commercial Union's duty to defend and potentially to indemnify Porter Hayden with respect to claims that fell within the 1948–49 and 1949–50 policy periods. Commercial Union filed several summary judgment motions. Specifically, Commercial Union (1) moved for summary judgment that the asbestos-related claims against Porter Hayden were properly matters of "products hazard" coverage and that, because Porter Hayden failed to purchase that coverage, Commercial Union owed no duty to defend or to indemnify; (2) moved for summary judgment that Porter Hayden's request for declaratory relief was barred by the statute of limitations; (3) moved for summary judgment that Porter Hayden's request for relief was foreclosed by its failure to comply with the notice-of-occurrence provisions of the alleged insurance policies; and (4) moved for partial summary judgment that any coverage obligation by Commercial Union to Porter Hayden could be based only on the 1949 and 1950 policies actually produced by Porter Hayden and not on the "missing policies" that Porter Hayden alleged provided coverage from 1941 to 1953.

The parties subsequently filed oppositions to the motions and replies to the oppositions. After hearings in January 1992, the circuit court, on 14 February 1992, issued a series of decisions and orders that resolved the motions in Porter Hayden's favor. The court also held that Porter Hayden was entitled to recover its reasonable attorneys' fees and costs incurred in bringing the declaratory judgment action. After the court modified two of its rulings and then reduced its orders to final judgment, Commercial Union noted an appeal and Porter Hayden brought a cross-appeal.

We will set forth additional facts as they are needed in our discussion of the individual issues that need to be addressed in resolving this appeal.

Commercial Union presents five issues on appeal:

I. "Whether the court below erroneously concluded that Commercial Union owes defense coverage and, potentially, indemnification to Porter Hayden for underlying asbestos-

related products liability lawsuits despite Porter Hayden's undisputed failure to purchase 'Products Hazard' coverage?"

II. "Whether the court erroneously concluded that this action, based on an insurance coverage dispute that arose in 1978, was timely under the applicable statute of limitations?"

III. "Whether the court erroneously concluded that Porter Hayden provided timely notice of occurrence to Commercial Union?"

IV. "Whether the court erroneously concluded that Porter Hayden demonstrated by 'clear and convincing' evidence the existence, terms and conditions of its alleged but missing Commercial Union policies?"

V. "Whether the court's award of reasonable attorneys' fees and litigation costs to Porter Hayden is justified or remains viable under applicable law?"

On cross-appeal, Porter Hayden presents two issues:

VI. "Did the trial court err in holding that Porter Hayden's coverage claims with respect to certain underlying asbestos actions are barred by the Maryland statute of limitations?"

VII. "Did the trial court err in holding as a matter of law that Porter Hayden is not entitled to recover its reasonable attorneys' fees and costs incurred in proving the existence and material terms of the missing insurance policies?"

## DISCUSSION

### Summary Judgment

A trial court shall enter judgment in favor of the moving party if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Md. Rule 2–501(e). The function of the summary judgment procedure is not to try the case, but merely to determine whether there are triable issues of fact. *King v. Bankerd,* 303 Md. 98, 111–12, 492 A.2d 608 (1985); *Coffey v. Derby Steel Co.,* 291 Md. 241, 247, 434 A.2d 564 (1981). "In reviewing a

disposition by summary judgment, we must decide whether a material factual issue exists, and in doing so, will resolve all factual inferences against the moving party." *Waller v. Maryland Nat'l Bank,* 95 Md.App. 197, 209, 620 A.2d 381 (1993). When the movant has set forth sufficient grounds for summary judgment, the opposing party must identify with particularity the material facts that are disputed. *King,* 303 Md. at 112, 492 A.2d 608; *Bond v. NIBCO, Inc.,* 96 Md.App. 127, 135, 623 A.2d 731 (1993). The proper standard for reviewing the grant or denial of a summary judgment motion is whether the trial court was legally correct. *Beatty v. Trailmaster Prods., Inc.,* 330 Md. 726, 737, 625 A.2d 1005 (1993); *Heat & Power Corp. v. Air Prods. & Chems., Inc.,* 320 Md. 584, 592, 578 A.2d 1202 (1990).

### Choice of Law

■ In the trial court, the parties raised the issue of which state's law should apply to this action—Maryland or New York. On appeal, only Commercial Union has addressed this question further, and it does so only briefly. Nevertheless, the choice-of-law issue is critical because its resolution will result in a disposition of the notice-of-occurrence issue in this appeal such that none of the other issues of either party need be addressed.

■ When presented with choice-of-law questions, Maryland courts generally follow the rule of *lex loci contractus,* which requires that the construction and validity of a contract be determined by the law of the state where the contract was made. *Allstate Ins. Co. v. Hart,* 327 Md. 526, 529, 611 A.2d 100 (1992); *Kramer v. Bally's Park Place, Inc.,* 311 Md. 387, 390, 535 A.2d 466 (1988); *Comstock Ins. Co. v. Thomas A. Hanson & Assocs., Inc.,* 77 Md.App. 431, 438, 550 A.2d 731 (1988). For choice-of-law purposes, a contract is made where the last act necessary to make the contract binding occurs. *Sting Sec., Inc. v. First Mercury Syndicate, Inc.,* 791 F.Supp. 555, 558 (D.Md.1992); *Travelers Indem. Co. v. Allied–Signal, Inc.,* 718 F.Supp. 1252, 1253 (D.Md.1989). Typically, "[t]he *locus contractu* of an insurance policy is the state in which the

policy is delivered and the premiums are paid." *Aetna Casualty & Sur. Co. v. Souras*, 78 Md.App. 71, 77, 552 A.2d 908 (1989). *See also Sting Sec., Inc.*, 791 F.Supp. at 558 (citing *Aetna Casualty & Sur. Co.*); *Allstate Ins. Co. v. Hart*, 327 Md. 526, 529, 611 A.2d 100 (1992) (Maryland courts ordinarily apply the law of the jurisdiction where the contract was made); *Mutual Life Ins. Co. v. Mullan*, 107 Md. 457, 463, 69 A. 385 (1908) (insurance contract was made where premium was paid and policy was delivered).

The circuit court determined that neither Commercial Union nor Porter Hayden established where the relevant last act in this case occurred. The court inferred that, in the absence of clear evidence to the contrary, the last act occurred in Maryland, where the 1949 and 1950 policies were ultimately delivered to Porter Hayden's president at his headquarters in Baltimore.

We conclude that the trial court was clearly erroneous in reaching this factual inference that resulted in its determining that Maryland law governed this litigation. *See* Md. Rule 8–131(c). In our view, the evidence established that the last act necessary to give the policy binding effect occurred in New York. That act was the delivery of the policies by ELAC's New York office to Porter Hayden's insurance broker in New York. We explain.

None of the material facts relevant to this issue is in dispute. Although ELAC was incorporated in Massachusetts at the time, the 1949 and 1950 policies in the instant case were issued from ELAC's New York office. These fully-executed and countersigned policies were delivered to the New York office of Johnson & Higgins, Porter Hayden's insurance broker at that time. Johnson & Higgins, in turn, delivered the policies to Porter Hayden's president, who maintained his headquarters in Baltimore. ELAC received the policy premiums from Johnson & Higgins in New York. In these circumstances, our inquiry focuses on whether the insurance contracts became binding upon ELAC's delivery to Johnson & Higgins in New York or upon Johnson & Higgins's delivery to

Porter Hayden in Maryland. Determination of this issue turns on Johnson & Higgins's role at the time it received the policies from ELAC: Was the broker an agent for the insured or the insurer?

Whether a broker represents the insurer or insured depends on the facts of the case. *Travelers Indem. Co. v. National Indem. Co.*, 292 F.2d 214, 220 (8th Cir.1961); 16 John A. Appleman, *Insurance Law & Practice* § 8727, at 341 (1981) [hereinafter 16 Appleman]. The general rule in Maryland and elsewhere is that a broker is the agent of the insured. *See Reserve Ins. Co. v. Duckett*, 240 Md. 591, 601, 214 A.2d 754 (1965); *Hankins v. Public Serv. Mut. Ins. Co.*, 192 Md. 68, 80, 63 A.2d 606 (1949); *Curran v. Industrial Comm'n of Ariz.*, 156 Ariz. 434, 436, 752 P.2d 523, 525 (Ariz.Ct.App.1988); *Continental Casualty Co. v. Aetna Ins. Co.*, 82 Ill.App.3d 402, 407, 37 Ill.Dec. 754, 759, 402 N.E.2d 756, 761 (Ill.App.Ct.1980). Maryland has recognized, however, that in some circumstances a broker serves in a dual capacity. For example, a broker may act as an agent of the insured with respect to procuring insurance and then act as the insurer's agent for purposes of delivering the policy and collecting the premium. *Grain Dealers Mut. Ins. Co. v. Van Buskirk*, 241 Md. 58, 66, 215 A.2d 467 (1965); *Sun Ins. Office, Ltd. v. Mallick*, 160 Md. 71, 82, 153 A. 35 (1931). The rationale for this principle is that, even absent evidence of a consensual agency relationship between the insurer and the broker, the insurer, by sending the executed policy to the broker, has entrusted the broker with the delivery of the policy and the collection of the premium, thereby implicitly authorizing the broker to act on the insurer's behalf. *See* Barry S. Ostrager & Thomas R. Newman, *Handbook on Insurance Coverage Disputes* § 18.-02[c] (5th ed. 1992) [hereinafter Ostrager & Newman]; 16 Appleman § 8731, at 373.

In the instant case, though, not only was there evidence that no consensual agency relationship existed between ELAC and Johnson & Higgins, but there was also uncontested evidence that Johnson & Higgins served as Porter Hay-

den's insurance agent from the 1940's to the 1960's. In a letter to Johnson & Higgins's New York office in 1985, Porter Hayden's counsel stated that "Johnson & Higgins served as insurance agent for [the Porter Hayden predecessor entities] for the period 1940 through 1964." In 1991, Porter Hayden's corporate designees, Mr. Charles W. Holtermann and Mr. Theodore O. Mannell, testified in depositions that they had no knowledge that was inconsistent with the statement in the 1985 letter that Johnson & Higgins acted as Porter Hayden's agent from 1940 to 1964. In addition, Howard S. Bush, a former ELAC employee from 1927 to the 1950's, testified that ELAC had no contractual or agency relationship with Johnson & Higgins during the period in question.[5]

The situation in this case is similar to the one in *Travelers Indemnity Co. v. Allied–Signal, Inc.*, 718 F.Supp. 1252 (D.Md. 1989). There, the insurer delivered the policies to the insured's agent in New York, and the agent in turn delivered them to the insured at its headquarters in New Jersey. The district court held that Maryland law would govern the dispute after determining that the doctrine of *renvoi*, a public policy exception to the general Maryland rule of *lex loci contractus* (an exception not applicable to the instant case), should apply. 718 F.Supp. at 1253–54. Nevertheless, the district court opined in dicta that under *lex loci contractus* New York law would apply. Emphasizing that the record was uncontradicted that the insurance broker was solely the agent of the insured, the court determined that delivery of the policies to the insured occurred in New York when the insurer delivered them to the broker. *Id.* at 1253 n. 2, 1258–59. *See also J.A.M. Assocs. of Baltimore v. Western World Ins. Co.*, 95 Md.App. 695, 705, 622 A.2d 818 (1993) (notice of policy changes

---

5. Mr. Bush became familiar with Johnson & Higgins and the Porter Hayden account through his various positions with ELAC in New York during the relevant time period. These positions included service as the assistant resident manager of the New York office and assignments in the underwriting and special risk management divisions of the company.

to broker, who was employed as insured's agent, constituted notice to insured).

On the facts of the instant case, then, we conclude that the insurance policies became binding upon their delivery by ELAC to Johnson & Higgins in New York. By virtue of Johnson & Higgins's continuous representation of Porter Hayden over an extended period of years, we believe that ELAC's mere entrusting of the delivery of the policies and collection of the premiums to Johnson & Higgins did not convert the broker to the status of agent for ELAC for these or any purposes. Johnson & Higgins retained its role as the insured's agent, and Commercial Union's delivery to Johnson & Higgins constituted delivery to the insured, Porter Hayden. Because delivery took place in New York, each contract is deemed to have been made in New York. Accordingly, New York law governs the substantive law issues in this case.

We acknowledge, however, that the application of the choice-of-law approach used by an increasing number of states, rather than *lex loci contractus,* may have resulted in a determination that Maryland law governs this case. Maryland's loyalty to *lex loci contractus* keeps it among the majority of jurisdictions that continues to follow that rule. That majority, however, is shrinking. The rule has been criticized as mechanistic and inflexible. A growing number of states have abandoned *lex loci contractus* in favor of the more flexible "most significant relationship" test of the Second Restatement of Conflict of Laws. *See* Eugene F. Scoles & Peter Hay, *Conflict of Laws* § 18.21 (2d ed. 1992). In these states, choice-of-law issues are decided by determining which state has the most significant contacts with the parties and the transaction. Restatement (Second) of Conflict of Laws § 188 (1971) [hereinafter Restatement]. *See, e.g., Oliver B. Cannon & Son, Inc. v. Dorr–Oliver, Inc.,* 394 A.2d 1160, 1166 (Del. 1978); *Unigard Ins. Group v. Royal Globe Ins. Co.,* 100 Idaho 123, 126, 594 P.2d 633, 636 (1979); *Lewis v. American Family Ins. Group,* 555 S.W.2d 579, 581–82 (Ky.1977); *Crown Center Redev. Corp. v. Occidental Fire & Casualty Co. of N.C.,* 716 S.W.2d 348, 358 (Mo.Ct.App.1986); *State Farm Mut. Auto.*

*Ins. Co. v. Estate of Simmons,* 84 N.J. 28, 35, 417 A.2d 488, 491–92 (1980); *Seattle–First Nat'l Bank v. Schriber,* 51 Or. App. 441, 445–47, 625 P.2d 1370, 1372–74 (1981); *Lee v. Saliga,* 179 W.Va. 762, 769–70, 373 S.E.2d 345, 352–53 (1988).

To determine which state has the most significant contacts, § 188 calls for an evaluation of relevant contacts such as place of contracting, location of the subject matter, and the place of incorporation and place of business of the parties. It also references § 6 of the Restatement, which identifies other, general considerations for the choice-of-law analysis, including: the relevant policies of the forum; the relevant policies of other interested states in the determination of the particular issue; the protection of justified expectations; and the basic policies underlying the particular field of law.

With respect to casualty insurance contracts, the Restatement sets forth a more specific rule:

> The validity of a contract of fire, surety or casualty insurance and the rights created thereby are determined by the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy, unless with respect to the particular issue, some other state has a more significant relationship ... to the transaction and the parties, in which event the local law of the other state will be applied.

Restatement § 193. Some insurance policies, like the CGL policy in the instant case, cover risks located in several states. In these multiple-risk situations, the authorities adopting the Restatement approach have treated such policies, with respect to the risks in a particular state, as if a separate policy had been issued to cover only the risks in that state. *See Baybutt Constr. Corp. v. Commercial Union Ins. Co.,* 455 A.2d 914, 918–19 (Me.1983); *Crown Center Redev. Corp.,* 716 S.W.2d at 358–59; *Ellis v. Royal Ins. Cos.,* 129 N.H. 326, 329–30, 530 A.2d 303, 306–07 (1987); *Bell v. Merchants & Businessmen's Mut. Ins. Co.,* 241 N.J.Super. 557, 564, 575 A.2d 878, 881–82, *cert. denied,* 122 N.J. 395, 585 A.2d 395 (1990). *But see Detroit Edison Co. v. Pacific Ins. Co.,* 742 F.Supp. 287, 289

(M.D.N.C.1990) (parties could not have expected that the contract would be subject to varying interpretations dependent only upon location of an occurrence that gave rise to a claim), *aff'd,* 944 F.2d 901 (4th Cir.1991). "The rationale for such a holding is based on the fact that the location of the insurance risk in a particular state pinpoints the jurisdiction that has the greatest interests in the contract and any issues arising therefrom." *Baybutt Constr. Corp.,* 455 A.2d at 919. It appears, then, that if Maryland were to adopt the approach advocated in § 193 Maryland law would govern in the instant case because the five plaintiffs in the underlying lawsuits alleged exposure to asbestos while they worked at the Bethlehem Steel Plant in Sparrows Point, Maryland, apparently one of the insured locations under the CGL policy.

Nevertheless, §§ 188 and 193 have not been adopted in Maryland. Indeed, no Maryland appellate court has even referred to those sections. The Court of Appeals followed, and apparently adopted, Restatement § 187 in *Kronovet v. Lipchin,* 288 Md. 30, 415 A.2d 1096 (1980). That section, which applies to situations where the contract contains a choice-of-law clause chosen by the parties, requires that the chosen state have a substantial relationship to the parties or the transaction. But the situation for which § 187 is intended—where the parties have selected a particular state's law to govern their rights and duties under the contract—is not the situation present in the case *sub judice.* In the absence of a contractual choice-of-law provision, as is the case here, § 188 (or § 193 when a fire, surety, or casualty insurance contract is involved) would be the applicable rule in a jurisdiction that has adopted the Restatement.

The Court of Appeals may very well view the instant case as presenting an appropriate opportunity to reconsider Maryland's adherence to the place-of-contracting rule and adopt the Second Restatement's flexible approach. And the Court may determine that under such an approach Maryland law should govern this insurance coverage dispute. Until that time, however, we are bound to follow the law as it currently exists; changing the law in Maryland is the province of the Court of

Appeals and the General Assembly. *Lex loci contractus* is old but not yet outdated, and remains the controlling law in this state.

### Notice of Occurrence

■ In view of our conclusion that the substantive law of New York governs the resolution of this appeal, we elect to address next whether the trial court correctly determined that Porter Hayden gave Commercial Union timely notice of occurrence as required under the policies. Commercial Union moved for summary judgment on this issue, claiming that Porter Hayden knew as early as the mid–1960's but no later than August 1976 that it would be subjected to third-party claims based on exposure to asbestos products and, therefore, its failure to give notice until August 1978 relieved Commercial Union of its duty to defend as a matter of law.

Porter Hayden responded that, in the context of claims for "progressive" injury or disease, such as asbestos-related diseases, the obligation to notify the insurer of an occurrence arises only upon the filing of a lawsuit by a person claiming to be injured by exposure to asbestos; in this case, that occurred in 1987. Before that time, Porter Hayden asserted, it had no knowledge of the " 'occurrences' at the time the 'occurrences' happened." Thus, Porter Hayden argued, because it gave notice to Commercial Union of the five lawsuits underlying the instant action within four months after they were served on Porter Hayden in 1987, it satisfied its obligation under the policies.

The trial court agreed with Porter Hayden and denied Commercial Union's motion for summary judgment. According to Commercial Union, "occurrence," which was not defined in the policies, was the knowledge, or reasonable certainty, that asbestos products could cause injury and result in the filing of claims against Porter Hayden. The court rejected this "definition":

> [I]t is simply not reasonable to interpret the notice of occurrence provisions of these contracts as requiring the insured to notify it[s] carrier of what amounts to the possi-

bility that someday someone might manifest some disease or injury for which liability might be claimed at law somewhere at some time. Such a broad construction of the notice requirement would be unduly burdensome, and would act to deprive most insureds of coverage.

Instead, the court gave its own definition of "occurrence": "[T]he notice ... obligation is generally triggered only when an insured has knowledge of a specific injury or event which, at the time it occurs, is known to have caused, or to be likely to cause, injury or loss." Finding that under Maryland law Porter Hayden gave notice to Commercial Union of the underlying lawsuits as soon as practicable, i.e., within four months after the suits were served on Porter Hayden in 1987, the court held that Porter Hayden's notice was timely as a matter of law.

On appeal, Commercial Union contends that Porter Hayden's argument—that only the service of an actual lawsuit triggers the notice-of-occurrence obligation in asbestos cases—fails to distinguish between the separate notice-of-occurrence and notice-of-claim requirements of the 1949 and 1950 policies. In Commercial Union's view, the relevant "occurrence" consisted of Porter Hayden's increasing knowledge in the 1950's and 1960's of the dangers of exposure to asbestos and its knowledge that thousands of workers had been exposed to Porter Hayden asbestos over the course of several decades. Commercial Union argues that this "informed anticipation of claims," not the claims themselves, triggers the notice-of-occurrence requirement. Finally, Commercial Union asserts that even if Porter Hayden's receipt of the initial 1976 lawsuit is deemed to be the triggering occurrence for notice purposes, Porter Hayden's two-year delay in giving notice to Commercial Union was untimely as a matter of law.

In urging us to uphold the lower court's decision, Porter Hayden reiterates its position that its lack of knowledge that any 1987 asbestos plaintiff sustained injury at the time of the alleged exposure during the Commercial Union coverage period is dispositive of the notice issue. In short, Porter Hayden

contends that it had no knowledge of any occurrences until it knew of the claims arising out of the occurrences.

We need not decide whether the trial court, under Maryland law, properly denied Commercial Union's motion on the issue of notice. As discussed earlier, New York law governs the issues of substantive law in this case. From our review of the relevant facts and authorities, we conclude that under New York law Porter Hayden did not satisfy its obligation to give Commercial Union timely notice of occurrence.

■ The 1949 and 1950 ELAC policies, as amended by the endorsement that substituted "occurrence" for "accident" throughout the policies, provide as follows:

> Notice of [Occurrence]. When an [occurrence] occurs written notice shall be given by or on behalf of the insured to the company or any of its authorized agents as soon as practicable. Such notice shall contain particulars sufficient to identify the insured and also reasonably obtainable information respecting the time, place and circumstances of the accident, the names and addresses of the injured and of available witnesses.

> Notice of Claim or Suit. If claim is made or suit is brought against the insured, the insured shall immediately forward to the company every demand, notice, summons or other process received by him or his representative.

Under New York law, compliance with notice-of-occurrence requirements is a condition precedent to an insurer's liability under the policy. *See Olin Corp. v. Insurance Co. of N. Am.*, 743 F.Supp. 1044, 1053 (S.D.N.Y.1990), *aff'd*, 929 F.2d 62 (2d Cir.1991). Courts applying New York law utilize a two-part test to determine whether the notice requirement has been satisfied. First, a court must decide when the obligation to give notice accrued. A court must then decide whether the insured did in fact give timely notice. *Olin Corp.*, 743 F.Supp. at 1053. If the notice was untimely, then the insured's claim for coverage fails because in New York, "[c]overage is completely barred by the insured's failure to give timely notice, whether or not the insurer was prejudiced by the delay."

*Olin Corp. v. Insurance Co. of N. Am.,* 762 F.Supp. 548, 565 (S.D.N.Y.1991), *aff'd,* 966 F.2d 718 (2d Cir.1992).[6]

■ An insured's notice obligation accrues when "the circumstances known to the insured at that time would have suggested to a reasonable person the possibility of a claim." *Commercial Union Ins. Co. v. International Flavors & Fragrances, Inc.,* 822 F.2d 267, 272 (2d Cir.1987). *See also Utica Mut. Ins. Co. v. Fireman's Fund Ins. Cos.,* 748 F.2d 118, 121–22 (2d Cir.1984) (obligation depends on the conclusions that a reasonable person would draw from the facts known to the insured); *Security Mut. Ins. Co. of N.Y. v. Acker–Fitzsimmons Corp.,* 31 N.Y.2d 436, 340 N.Y.S.2d 902, 904–05, 293 N.E.2d 76, 78–79 (1972) (insured must exercise reasonable care to keep informed of accidents out of which claims for damages may arise).

The record extract demonstrates that for years before the initial suit in 1976 Porter Hayden had accumulated knowledge of the harmful nature of asbestos. As Commercial Union established in support of its motion for summary judgment below, Porter Hayden, among other things: (1) received asbestos-related workers' compensation claims beginning in the early 1950's; (2) learned in 1964 of a warning label adopted by Johns–Manville, a major asbestos manufacturer, indicating that the inhalation of asbestos dust was hazardous to human health; and (3) learned in 1964 of the findings contained in a major medical study, later published in 1965, that linked exposure to asbestos to the high incidence of pulmonary diseases among asbestos insulation workers. We reject, however, Commercial Union's argument that these circumstances, on their own, gave rise to Porter Hayden's obligation to provide notice no later than 1965. While these events no doubt should have sounded an alarm to Porter Hayden that

---

6. Maryland law on the issue of notice differs from New York law in that an insurer must show that it suffered actual prejudice from the insured's failure to comply with the notice-of-occurrence requirement. Md.Ann.Code art. 48A, § 482 (1991); *Washington v. Federal Kemper Ins. Co.,* 60 Md.App. 288, 293, 482 A.2d 503 (1984), *cert. denied,* 302 Md. 289, 487 A.2d 292 (1985).

the growing body of knowledge about asbestos hazards warranted the company's serious attention to the matter, we do not believe that the circumstances at that time were such as to suggest to a reasonable person the possibility of a claim. Although there were several workers' compensation claims related to asbestos diseases over the years, there was no strong or unequivocal indication of the asbestos litigation that eventually flooded the nation's courts beginning in the mid–1970's. Indeed, Porter Hayden did not receive its first third-party liability claim for asbestos-related injuries until 1976.

That claim and the ones that followed immediately thereafter, however, did trigger Porter Hayden's notice obligation. The record extract clearly reflects that beginning in August 1976, Porter Hayden was served with lawsuits alleging injuries from exposure to asbestos in the insulation that it installed. Thus, in view of Porter Hayden's increasing knowledge of the danger presented by prolonged exposure to asbestos, the filing of the 1976 lawsuits should have suggested to a reasonable person the possibility of additional asbestos-related claims for which it might seek coverage from Commercial Union. In fact, in letters dated 3 September 1976 and 15 September 1976, counsel for Porter Hayden advised Porter Hayden's then insurance broker to notify Porter Hayden's primary and excess carriers of the asbestos claims. These facts establish that under New York law Porter Hayden's obligation to put Commercial Union on notice that an occurrence took place accrued in August 1976. *See Olin Corp. v. Insurance Co. of N. Am.,* 966 F.2d 718, 723–24 (2d Cir.1992); *Olin Corp. v. Insurance Co. of N. Am.,* 743 F.Supp. 1044, 1054–55, (S.D.N.Y.1990), *aff'd,* 929 F.2d 62 (2d Cir.1991) (per curiam).

The second step of the analysis is determining whether the notice given by the insured was timely. The notice provision in the insurance policies required Porter Hayden to notify Commercial Union of an occurrence "as soon as practicable." New York law indicates that this means "within a reasonable time under all the circumstances." *Olin Corp.,* 743 F.Supp. at 1053. Indeed, it is well settled that

the phrase "as soon as practicable" is an elastic one, not to be defined in a vacuum. By no means does it connote an ironbound requirement that notice be "immediate" or even "prompt", relative as even those concepts often are; "soon", a term close to each of these in common parlance, is expressly qualified in the policy here by the word "practicable". Nor [is] compliance with the insurance policy's temporal requirement to be measured simply by how long it was before written notification came forth. More crucial [is] the reason it took the time it did. So, the provision that notice be given "as soon as practicable" call[s] for a determination of what was within a reasonable time in the light of the facts and circumstances of the case at hand.

*Mighty Midgets, Inc. v. Centennial Ins. Co.,* 47 N.Y.2d 12, 416 N.Y.S.2d 559, 562, 389 N.E.2d 1080, 1083 (1979). The reasonableness of a delay may ordinarily be a triable issue, but "in the absence of an excuse or mitigating factors, courts have addressed that question as a legal matter." *Id.* The New York case law reveals that even short periods of delay have been found unreasonable as a matter of law. *See, e.g., Commercial Union Ins. Co. v. International Flavors & Fragrances, Inc.,* 822 F.2d 267, 272 (2d Cir.1987) (eighteen months); *Utica Mut. Ins. Co. v. Fireman's Fund Ins. Cos.,* 748 F.2d 118, 121 (2d Cir.1984) (six months); *Olin Corp.,* 743 F.Supp. at 1055 (one year); *Power Auth. v. Westinghouse Elec. Corp.,* 117 A.D.2d 336, 339, 502 N.Y.S.2d 420, 423 (1986) (53 days).

In the case before us, Commercial Union did not receive notice of any asbestos-related occurrences or claims involving Porter Hayden until another of Porter Hayden's insurers, in a letter dated 31 July 1978, requested Commercial Union to acknowledge its obligation to provide indemnification to Porter Hayden for an asbestos claim that had just been filed. Shortly thereafter, on 8 August 1978, Porter Hayden wrote to Commercial Union requesting the insurer's defense against the recently filed lawsuit. It is clear, then, that Commercial Union's first notice of occurrence involving Porter Hayden came two years after Porter Hayden's obligation to provide

notice accrued. The question now is whether that delay was reasonable under all the circumstances.

Our survey of cases applying New York law to the issue of timely notice reveals that New York takes a firm view regarding notice clauses in insurance contracts. The courts have strictly enforced notice requirements and do not hesitate to relieve an insurer of its policy obligations when an insured fails to give timely notice of occurrence or notice of claim. *Christiana Gen. Ins. Corp. of N.Y. v. Great Am. Ins. Co.*, 745 F.Supp. 150, 157 (S.D.N.Y.1990); *Travelers Ins. Co. v. Buffalo Reins. Co.*, 735 F.Supp. 492, 499 (S.D.N.Y.1990).[7] Indeed, "[t]he right of an insurer to receive notice has been held to be so fundamental that the insurer need show no prejudice to be able to disclaim liability on this basis." *Allstate Ins. Co. v. Furman*, 84 A.D.2d 29, 445 N.Y.S.2d 236, 239 (1981), *aff'd*, 58 N.Y.2d 613, 458 N.Y.S.2d 532, 444 N.E.2d 996 (1982).

Courts have barred insureds' claims for coverage even when doing so has had a harsh economic effect on the insureds. This is so even in the context of mass tort situations. The decision in *Olin Corp. v. Insurance Co. of North America*, 966 F.2d 718 (2d Cir.1992), *aff'g* 762 F.Supp. 548 (S.D.N.Y.1991), is one example. The Olin Corporation manufactured DDT at a plant in Huntsville, Alabama. It was discovered as early as 1948 that DDT was leaking from the plant. Throughout the next three decades, numerous tests and studies by government agencies and other organizations established both the hazardous properties of DDT and the existence of increasingly toxic concentrations of DDT in the soil surrounding the plant and the stream into which the plant's drainage flowed. 966 F.2d at 720. Olin knew about the leakage and initiated efforts to reduce the amounts of DDT that escaped from the plant. The company eventually shut down its operations at the Huntsville plant. *Id.*

---

**7.** On reconsideration, the judgment in *Travelers Insurance Co.* was vacated, but the opinion did not change the analysis of the "reasonable notice" standard. 739 F.Supp. 209 (S.D.N.Y.1990).

On 9 July 1979, Olin was sued by people from the commercial fishing industry who alleged personal injury and property damage resulting from the DDT pollution from the plant. In early 1980, lawsuits were filed against Olin by residents of Triana, a town situated downstream from the plant. These suits alleged that the plaintiffs had eaten fish and drunk water contaminated with DDT from the Huntsville plant. *Id.* at 721.

Shortly after receiving service of the 1980 suits, Olin notified two of its insurers: Insurance Company of North America and Employers Insurance of Wausau. In December 1980 and October 1981, two more actions were filed against Olin, again by residents of Triana. These suits, together with the earlier Triana suits, were brought on behalf of 1200 people who alleged injuries from the consumption of DDT-contaminated food and water. *Id.*

On 16 November 1981, Olin gave Hanover Insurance Company, yet another of its insurers, notice of these DDT-related claims. One year later, Olin settled most of the lawsuits by agreeing to pay $24 million over five years. *Id.* Shortly after the settlement was publicly announced, Olin was sued by several other plaintiffs who represented over 10,000 people from areas more distant from the plant than the plaintiffs in the "first-wave" actions. Olin notified Hanover and its other insurers of these actions. Three years later, Olin settled these "second-wave" lawsuits for $15 million. *Id.*

In 1983, Olin sued many of its primary and excess insurance carriers to recover the costs of its defense and indemnification for its losses in settling the DDT lawsuits. *Id.* Hanover moved for partial summary judgment on the ground that Olin's notice of occurrence was untimely. *Id.* at 722. The Second Circuit agreed with the district court's determination that Olin's obligation to provide notice to Hanover of the DDT-related occurrence accrued at the latest on 9 July 1979, when the first lawsuit was filed. *Id.* at 723. Because Olin's notice was given two and a half years after that date, and twenty months after Olin's notice to its other insurers, Olin's delay was unreasonable as a matter of law. *Id.*

The court rejected Olin's argument that its 1981 notice to Hanover was timely as to the 1983 second-wave lawsuits because it could not reasonably anticipate the more attenuated claims of persons who resided farther away than the first-wave plaintiffs. Noting that the "existence of the first wave claims made the second-wave claims inevitable," the court held that the policy's notice provisions obligated Olin to notify Hanover not only when it learned of a particular identified injury, but also when it had information "reasonably to apprehend that a colorable claim of injury resulting from the DDT leakage might be made." *Id.* at 724.

Another illustration of New York's normally strict adherence to notice obligations is found in another case involving Olin Corporation. In *Olin Corp. v. Insurance Co. of North America,* 743 F.Supp. 1044 (S.D.N.Y.1990), *aff'd,* 929 F.2d 62 (2d Cir.1991) (per curiam), Olin sought a declaratory judgment that various insurers owed it a duty to defend and indemnify Olin in connection with events involving mercury contamination. From 1954 to 1972, Olin operated a chlor-alkali plant in Saltville, Virginia. It produced chlorine using a process that deposited mercury-contaminated wastes into a nearby river. Olin learned of the mercury problem in the early 1970's via studies conducted by Virginia state authorities and environmental groups. 743 F.Supp. at 1046.

Olin closed the plant in 1972 and agreed to undertake remedial action concerning the river and the surrounding soil. In 1976 and 1978, Olin retained counsel to analyze Olin's potential liability for past and continuing discharges of mercury. The memoranda prepared by the law firm outlined Olin's probable liability under state and federal statutes and state and federal common law. *Id.* at 1046–47.

In 1982, Olin and a task force comprised of several state and federal agencies negotiated and drafted a consent decree that set forth Olin's cleanup and remediation obligations. The decree also contained a provision that explicitly did not release Olin from future liability.

By 1983, Olin had undertaken a number of remedial projects that cost over $4 million. On 31 March 1983, Olin wrote to its insurance broker to advise that Olin was making claims to its primary and excess insurers for indemnification of the costs resulting from property damage caused by the leakage of mercury. The insurance broker forwarded Olin's letter to the insurers on 12 April 1983. *Id.* at 1048.

The insurers moved for partial summary judgment on the issue of notice. The district court granted these motions, determining that "by early 1982 at the latest, Olin had information which would suggest to a reasonable person the possibility of a claim or which appeared reasonably likely to involve liability on the part of its insurers." *Id.* at 1054. The court concluded that Olin's failure to notify the insurers until one year later was untimely as a matter of law. *Id.* at 1055.

*Ogden Corp. v. Travelers Indemnity Co.*, 739 F.Supp. 796 (S.D.N.Y.1989), *aff'd*, 924 F.2d 39 (2d Cir.1991), is another example. There, the lessor of certain property in California was required by California authorities to clean up hazardous substances that were contaminating the property. The lessor claimed that the lessee, the insured, a scrap metal processor, had caused the contamination to occur continuously from 1950 through 1983. The insured received the lessor's complaint on 22 April 1988 and promptly notified its insurer, the American Motorists Insurance Company. *Id.* at 797, 801.

The court determined, however, that the insured's notice obligation accrued as early as 1985, when the insured received correspondence from the lessor indicating (1) the nature of the contamination, (2) the lessor's opinion that the insured's operations caused the contamination, and (3) the lessor's belief that the cleanup costs should be shared by the lessor and the insured. *Id.* at 801. In addition, in 1985 the insured notified one of its other insurers, the Travelers Indemnity Company, of the lessor's possible claims. The insured stated that it did not notify American Motorists at that time because it did not know until the actual complaint was filed which policy periods would be implicated. The court rejected this explanation.

"[The] notice to Travelers is an admission that [the insured was] fully aware of the possibility of a claim by [the lessor], and the necessity of notifying [its] insurer of such claim." *Id.* The court added, "An insurer need not be given every detail to be on notice of a possible claim," and held that the two and a half year delay was untimely as a matter of law. *Id.* at 801–02.

Other decisions by courts applying New York law illustrate a pattern of fairly strict application of the notice requirements to bar the insured from coverage. *See, e.g., Olin Corp. v. Insurance Co. of N. Am.*, 771 F.Supp. 76 (S.D.N.Y.1991), *aff'd*, 972 F.2d 1328 (2d Cir.1992); *New York v. Amro Realty Corp.*, 697 F.Supp. 99 (N.D.N.Y.1988), *aff'd on reh'g*, 745 F.Supp. 832 (N.D.N.Y.1990), *aff'd in part & rev'd in part on other grounds*, 936 F.2d 1420 (2d Cir.1991); *Power Auth. v. Westinghouse Elec. Corp.*, 117 A.D.2d 336, 502 N.Y.S.2d 420 (1986).

The results of the above cases and others are based in no small part on the policy that underlies New York's strong support for compliance with notice requirements. Courts applying New York law uniformly recognize that compliance with notice-of-occurrence provisions promotes important policy goals:

> Notice-of-occurrence provisions ... enable insurers to make a timely investigation of relevant events and exercise early control over a claim. Early control may lead to a settlement before litigation and enable insurers to take steps to eliminate the risk of similar occurrences in the future.

*Commercial Union Ins. Co. v. International Flavors & Fragrances, Inc.*, 822 F.2d 267, 271 (2d Cir.1987) (citation omitted). *See generally* Ostrager & Newman § 4.02[a] & [b]. The court in *Olin Corp. v. Insurance Co. of North America*, 966 F.2d 718 (2d Cir.1992), stated:

> Notice-of-occurrence provisions allow insurance companies to make an early investigation into the particular circumstances of an occurrence, both as an aid to future litigation and as a means of ending or correcting dangerous conditions. Additionally, timely notice of occurrence assists in-

surers in estimating the amount of capital they need in reserve for future claims, and the amounts they must charge as premiums. Finally, these provisions aid insurers in the detection of fraudulent claims.

*Id.* at 723. *See also Travelers Ins. Co. v. Buffalo Reins. Co.,* 735 F.Supp. 492, 499 (S.D.N.Y.1990) (discussing goals of adequate investigation and establishment of adequate reserves); *Allstate Ins. Co. v. Furman,* 84 A.D.2d 29, 445 N.Y.S.2d 236, 239 (N.Y.App.Div.1981) (notice given as soon as is reasonably practicable serves important investigative and fraud-prevention purposes), *aff'd,* 58 N.Y.2d 613, 458 N.Y.S.2d 532, 444 N.E.2d 996 (1982).

The unifying theme of these goals is providing the insurer with an opportunity to protect its interests. In *Olin Corp. v. Insurance Co. of North America,* 743 F.Supp. 1044 (S.D.N.Y. 1990), *aff'd,* 929 F.2d 62 (2d Cir.1991) (per curiam), for example, the holding can generally be justified on the ground that the insured's delay in providing notice failed to promote—indeed, directly contravened—the desired policy goal of enabling an insurer to participate in the pending or forthcoming litigation. Olin's late notice to its insurers precluded any or all of them from participating in the negotiation of the consent decree between Olin and the task force. The district court observed that "Olin's insurers were entitled to participate in the negotiations with the interagency task force and the selection of abatement measures." 743 F.Supp. at 1054.

Similarly, in *Ogden Corp. v. Travelers Indemnity Co.,* 739 F.Supp. 796 (S.D.N.Y.1989), *aff'd,* 924 F.2d 39 (2d Cir.1991), during the two and a half years that elapsed between the occurrence and the notice to the insurer, the third party that sued the insured initiated costly cleanup activities for which it later sought reimbursement. *Id.* at 801. When the insured finally notified its insurer of the occurrence, the insurer was unable to seek to minimize the costs of the cleanup and thereby minimize its losses.

Thus, New York's hard and fast application of the notice-of-occurrence requirement results whenever doing so advances

the state's strong policy of protecting the rights of insurers in the conduct of their business. When that policy is not advanced, however, the justification for imposing a strict interpretation of the notice obligation on an insured is weakened. The rule is that notice must be given within a reasonable time under all the circumstances; it is not that notice must be given as soon as possible. *See Mighty Midgets, Inc. v. Centennial Ins. Co.*, 47 N.Y.2d 12, 416 N.Y.S.2d 559, 562, 389 N.E.2d 1080, 1083 (1979) ("as soon as practicable" is an "elastic" phrase that does not require that notice be immediate). Thus, when the circumstances warrant, the notice obligation may not require an immediate or near-immediate notification of the insurer. Nevertheless, from our review of the facts, the law, and the circumstances of this case, we conclude that Porter Hayden's notice to Commercial Union was not given within a reasonable time and, thus, was untimely as a matter of law.

As a result of our holding on this issue, we need not, and do not, reach the other issues posed by the parties.

JUDGMENT REVERSED.

COSTS TO BE PAID BY PORTER HAYDEN COMPANY.